[No. E032661. Fourth Dist., Div. Two. Dec. 18, 2003.]

WILLIAMS COMMUNICATIONS, LLC, Plaintiff and Appellant, v. CITY OF RIVERSIDE et al., Defendants and Appellants.

644

## COUNSEL

Nossaman, Guthner, Knox & Elliott, Alvin S. Kaufer, James C. Powers and Winfield D. Wilson for Plaintiff and Appellant.

Burke, Williams & Sorensen and Stephen R. Onstot for Defendants and Appellants.

## OPINION

**HOLLENHORST, J.**—On September 13, 2000, the City of Riverside (City) and Williams Communications, Inc. entered into a license agreement. The agreement allowed Williams to install fiber optic cable in conduit laid in the streets of Riverside in consideration of the payment of $1.50 per foot of conduit. The payment due under the agreement totaled $750,103. Williams paid that sum and then filed this action to recover it. After a court trial, the trial court found that the payment was legal and that Williams was not entitled to refund of the $750,103. Williams appeals. We reverse.

### FACTS

The parties stipulated to the following relevant facts: "Williams Communications received the certifications and authorizations provided for in all orders and decisions of the California Public Utilities Commission which refer to Williams Communications by name. [¶] Williams Communications installed conduit, fiber optic cable, and related equipment ('facilities') in streets in the City of Riverside. [¶] Williams Communications is a nondominant interexchange carrier and has been licensed as such at all relevant times by the CPUC. [¶] The facilities are part of Williams Communications' statewide and nationwide fiber optic network. [¶] Issuance of a permit was required for construction of the facilities. [¶] The City of Riverside did not deposit said sum [*sic*] of $750,103 in a separate capital facilities account. [¶] The license agreement provision for payment of $750,103 was not approved by voters of the City of Riverside. [¶] On December 14, 2001, the City of Riverside refunded to Williams Communications $356,779 out of the $750,103 that was

paid by Williams Communications on August 22, 2000." (Corporate capacity stipulations and sentence numbering omitted.)

## THE REFUND ACTION

On February 16, 2001, Williams filed its complaint to recover the $750,103. Three causes of action were asserted: (1) for recovery of funds paid under protest; (2) for recovery of funds paid under economic duress and (3) for declaratory relief.

The first cause of action alleged that Williams is a telephone corporation regulated by the California Public Utilities Commission; that defendants had required it to enter into the license agreement and to pay the $750,103 as a condition of installing telephone lines in roads in Riverside; that it had paid said sum under protest; that it had sought refund under the Mitigation Fee Act (Gov. Code, § 66000 et seq.) and the Government Claim Act (Gov. Code, § 900 et seq.); and that it was entitled to refund because the sum charged was illegal because it exceeded the reasonable costs incurred by the City as a result of the installation of conduit in the streets of the City.

The second cause of action alleged that the money was paid under economic duress because delays in constructing the lines would subject Williams to substantial financial loss and penalties.

The third cause of action seeks declaratory relief to invalidate two provisions of the licensing agreement. The complaint alleges that the first provision requires payment of the $750,103 and other sums determined from time to time by Riverside. The second provision imposes a 35-year term on the licensing agreement. These provisions are alleged to be unlawful, and a declaration of illegality is requested.

## TRIAL AND DECISION

At trial, Williams argued that it had the right to install its cable in the city streets without payment of more than the City's reasonable costs. Accordingly, the payment of $750,103 under the license agreement was illegal under Public Utilities Code section 7901 and Government Code section 50030.[1] Williams also argued that the payment was coerced and that it had the right to recover the illegal payment under the Mitigation Fee Act (Gov. Code, § 66000 et seq.).

---

[1] Unless otherwise indicated, all further statutory references in the following four parts are to the Public Utilities Code.

The City argued the payment was not a fee or other exaction, but was rather a negotiated amount which was consideration for various concessions made by the City. The City found no economic duress, and argued that recovery was unavailable under the Mitigation Fee Act.

The trial court found that the Mitigation Fee Act is inapplicable because the "City did not purport to impose the subject license fee on plaintiff to mitigate or defray the cost of any alleged impacts on public improvements or facilities." Since the court found that Williams was not charged a mitigation fee, the refund provisions of the Act were inapplicable. The court also found that the licensing fee was not illegal under section 7901 because "Plaintiff has failed to disprove defendants' position that the City could require a license agreement because plaintiff's cable would carry open video, cable TV, [and] Internet services which are not subject to Public Utilities Code § 7901." For the same reason, Government Code section 50030 was found inapplicable. Finally, the trial court found that "Williams has failed to established [*sic*] that the City engaged in any wrongful act to support its claim for economic duress."

Subsequently, the trial court awarded the City $212,861 as its attorney fees. The City cross-appeals, contending that the trial court erred in denying its request for additional postjudgment attorney fees.

## ISSUES AND STANDARD OF REVIEW

Williams contends that the provision in the licensing agreement which requires it to pay $750,103 to the City is illegal under section 7901 and Government Code section 50030.

The City contends that the provision was not illegal because the City did not require the payment. Instead, the City argues that the payment was a negotiated amount which settled pending issues and potential claims. The City also argues that the Mitigation Fee Act is inapplicable because the City did not impose a mitigation fee, that there was no economic duress, and that various other issues should be decided in its favor.

Our review is de novo because the essential facts were stipulated and the issues raised by the parties are primarily issues of statutory interpretation. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800–801 [35 Cal.Rptr.2d 418, 883 P.2d 960].) For the reasons stated below, we do not need to consider the cross-appeal.

## THE REGULATION OF TELEPHONE COMPANIES

The California Constitution provides that telephone companies are public utilities subject to control by the Legislature. (Cal. Const., art. XII,

§ 3.) The Public Utilities Act defines a telephone company as a company which owns, controls, operates or manages a telephone line for compensation in California. (§§ 201, 234, subd. (a).) A telephone line includes conduits and other real estate, fixtures and personal property used to facilitate communication by telephone. (§ 233.)

A telephone company must obtain a certificate of public convenience and necessity from the California Public Utilities Commission in order to construct new facilities. (§ 1001.) It may use the public highways to install its facilities. (§ 7901.) "[Former Civil Code s]ection 536 [now section 7901] has been judicially construed by many decisions of this court, and it has been uniformly held that the statute is a continuing offer extended to telephone and telegraph companies to use the highways, which offer when accepted by the construction and maintenance of lines constitutes a binding contract based on adequate consideration, and that the vested right established thereby cannot be impaired by subsequent acts of the Legislature. [Citations.]" (*County of L. A. v. Southern Cal. Tel. Co.* (1948) 32 Cal.2d 378, 384 [196 P.2d 773].) Thus, telephone companies have the right to use the public highways to install their facilities.

The local government may "exercise reasonable control as to the time, place, and manner in which roads, highways, and waterways are accessed." (§ 7901.1, subd. (a).) Although the telephone company may use the streets without paying for the privilege (*City of Salinas v. Pacific Tel. & Tel. Co.* (1946) 72 Cal.App.2d 494, 497 [164 P.2d 905]), the local government may impose a reasonable charge which "shall not exceed the reasonable costs of providing the service for which the fee is charged and shall not be levied for general revenue purposes." (Gov. Code, § 50030.)

## THE LICENSE AGREEMENT

Although Williams advances several statutory arguments, its primary argument is that the section of the license agreement which provides for the payment of $750,103 to the City is illegal under section 7901 and Government Code section 50030.

The challenged provision is section 2 of the license agreement. It provides, in relevant part: "In exchange for the agreements made herein, Licensee agrees to pay Licensor for the use of the Licensed Premises at a value of $1.50 per conduit per foot."[2]

---

[2] Under this formula, Williams paid $750,103. The formula also provided for an adjustment depending on the actual footage of conduit installed. Since less conduit was installed than originally contemplated, Williams was subsequently paid a refund of $356,779.

Section 7901 provides: "Telegraph or telephone corporations may construct lines of telegraph or telephone lines along and upon any public road or highway, along or across any of the waters or lands within this State, and may erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters." A "telephone line" includes conduits used "in connection with or to facilitate communication by telephone . . . ." (§ 233.)

The City contends that section 7901 is inapplicable because Williams failed to show that it is a telephone corporation which will use the right-of-way on City streets to provide telephone services. The City cites the trial testimony of Robert Jackson, Williams's Vice-president of Construction. Mr. Jackson, an engineer, testified that Williams has a nationwide fiberoptic network "comprised of over 33,000 miles of fiber that provides voice, data, video, and internet transmission services." The City argues that, since there was no allocation of usage between telephone services and nontelephone services, section 7901 is inapplicable.

The City also cites the testimony of Kathi Head, its former real property services manager: "With Williams Communications they were providing infrastructure. And at any given point in time they could not tell us exactly what was being transmitted through that infrastructure at that time, what kinds of services were being transmitted, and they couldn't tell us particularly the lines that were reserved for the future."

The trial court accepted the City's argument. It held that "telephone companies may install and maintain telephone cables without compensating local agencies for the use of the public right-of-way. [Citation.] However, this exemption applies only when telephone companies install cables for predominant use as telephone lines. [Citations.] If a telephone company installs cables to be used for non-telephone purposes, it is not protected by Public Utilities Code § 7901. [Citation.] Plaintiff has failed to disprove defendants' position that the City could require a license agreement because plaintiff's cable would carry open video, cable TV, [and] Internet services which are not subject to Public Utilities Code § 7901."[3]

As noted above, the first prong of the City's argument is that Williams must show that it is a telephone company. But the uncontradicted evidence

---

[3] We note that the trial court erred in including cable television in the list. Cable television companies are subject to local regulation and franchise agreements. (Gov. Code, § 53066.) But there was no evidence here to support the conclusion that Williams was providing cable television services. The license agreement specifically provides that Williams may not provide cable television services without obtaining a franchise to do so.

clearly establishes that it is. As an attorney for Williams explained, in the same letter as quoted above, "Williams provides intrastate, interstate, and international telephone services to the public or classes of public as a public utility/common carrier. The [California Public Utilities Commission] authorized Williams to offer resold and facilities-based intrastate, interexchange, telephone services pursuant to [a certificate of public convenience and necessity]. The latter Decision 99-10-062 further authorized Williams to construct telephone facilities in California." (Fn. omitted.)

The decision of the Public Utilities Commission was entered into evidence. It states: "A certificate of public convenience and necessity is granted to Williams Communications, Inc., dba Vyvx, Inc. (applicant), to provide facilities-based interexchange services subject to the terms and conditions set forth below and in Decision 99-05-022." The referenced decision granted Williams authority to operate as a reseller for interexchange telecommunications services.

In addition, the City stipulated that Williams is a nondominant interexchange carrier licensed by the Public Utilities Commission. A nondominant interexchange carrier "is one of the classifications of telephone corporations established by the California Public Utilities Commission."

In its respondent's brief, the City states: "It is true that Williams is registered as [a] 'telephone corporation' with the Public Utilities Commission—but that registration only means that Williams may provide 'telephone services.' " The City argues that such registration does not allow Williams to overbuild its facilities to sell or lease to others, nor does it allow Williams to provide nontelephone services.[4]

---

[4] At oral argument, counsel for the City forcefully urged that Williams failed to prove the applicability of section 7901 because only three lines were authorized by the Public Utilities Commission, and Williams built 17 lines. The City urges that it could charge Williams for the excess lines because Williams did not prove that the lines would be used for future telephone services. We note, however, that the cited Public Utilities Commission decision merely authorizes Williams to provide facilities-based authority to provide resold interexchange telecommunications services. The City urges that a three-line limitation is found in an "Initial Study/Final Mitigated Declaration," which describes the project as the installation of "three conduits along most of the project routes." It is not clear that this reference limits Williams to three conduits but, even if it does, the City's license fee applies to all conduit installed by Williams. The license agreement specifically allows assignment of three conduits to Intouch Communications so long as it has a certificate of public convenience and necessity from the Public Utilities Commission and the fee applies to that conduit as well.

Although the overbuilding of facilities could become an issue in some circumstances, the building of facilities is and should be regulated by the Public Utilities Commission, not the City. Even Williams's counsel agreed that overbuilding would be subject to a reasonableness standard, and we believe the Public Utilities Commission would correct any problems arising

The fundamental issue, therefore, is whether the City may levy charges for use of the City streets to a telephone company when the telephone company lines may carry signals which are not telephone signals.

During the negotiations leading to the license agreement, an attorney for Williams described the signals which would be carried in the fiber optic conduit as follows: "The cables do one thing: they carry digitized optical signals (i.e. 1's and 0's) for customers, the content of which is neither controlled nor manipulated by Williams. Once the digital signals leave the Williams system, customers convert the signals into different forms of information, such as voice, music, video, computer data, facsimile material and other forms. Any particular cable or fiber may carry digital signals at any given time that will be converted for telephone, video, internet and/or other forms of information. . . . Williams does not and cannot, as a matter of technology, determine the particular form of information carried on its lines at or over any given period of time."

Mr. Jackson testified: "Essentially the signals will originate at a customer premises. The signal may then enter one of the local carriers. One of the most prominent would be a Bell company, one of the local providers, who then connects to our point of presence in a certain city. That is where the signal enters our network. At that point it is picked up and transmitted to the destination point where it exits our network at the point of presence in that city and then traverses through a local carrier to the other premises where the signal terminates." He also testified that voice transmission was the single largest segment of Williams's business.

The City does not disagree with this description of Williams's business. Its real estate manager testified: "An interexchange carrier, according to my understanding, is what's sometimes called a carrier's carrier. They don't provide services themselves to the businesses or to the residences, but rather they install infrastructure, conduit, cable, and they lease that conduit or cable to other providers. Some of the providers may provide the local service. Some of them don't. So—It's also what's called a long-haul carrier. They're just going through."

The City's legal position is that "[i]n order to be entitled to protection under § 7901, a company must *actually* provide telephone service." It cites

from overbuilding. In any event, as discussed below, the Legislature has acted to encourage the development of communications infrastructure, and we reject the City's argument that only lines presently used for telephone services are subject to section 7901.

The City's view is too narrow: Since development of infrastructure must include planning for future growth and development, we interpret the statute to include the conduit installed by Williams which will be used for future growth. Specifically, we disagree with the City's position that it could charge for such unused lines based on the assertion that they were not telecommunications facilities within the meaning of Government Code section 50030.

*City of San Diego v. Southern etc. Tel. Corp.* (1954) 42 Cal.2d 110 [266 P.2d 14]: "[T]he state offers to telephone corporations a franchise to construct lines along or upon any public road or highway. The franchise is accepted when such a corporation constructs its lines on the public road or highway and maintains and operates a telephone system. [Citation.] When a telephone corporation obtains a franchise under [former Civil Code] section 536, it need not obtain a franchise from local authorities. [Citation.]" (*Id.* at p. 116.)

Our Supreme Court subsequently rejected the City's argument in *Pac. Tel. & Tel. Co. v. City of Los Angeles* (1955) 44 Cal.2d 272 [282 P.2d 36]: "[The city contends] that the state franchise does not give Pacific the right to use its telephone lines for the transmission of anything other than 'articulate speech.' [¶] [Former Civil Code s]ection 536, which authorizes telephone companies to construct their lines along public highways, places no restrictions upon what may be transmitted by means of electrical impulses over those lines, and we are of the view that the rights of Pacific with respect to the uses to which its lines may be put are correctly declared in the judgment. If the state franchise granted to a telephone company were limited to the transmission of 'articulate speech,' the company would be required to obtain numerous local franchises in order to give its subscribers the benefit of the many and varied uses of telephone wires made possible by scientific development. Such a result would defeat the very purpose of [former Civil Code s]ection 536, as it would interfere substantially with the ability of telephone companies to provide adequate communication service to the people of the state. [Citation.]" (*Id.* at pp. 281–282.)

█ The Public Utilities Commission has the power to regulate utilities. (Cal. Const., art. XII, § 8; § 701.) The reason is obvious: conflicting local regulations would stifle the growth of utilities and impede their ability to serve the public interest. (*Southern Cal. Gas Co. v. City of Vernon* (1995) 41 Cal.App.4th 209, 215 [48 Cal.Rptr.2d 661], quoting *Los Angeles Ry. Corp. v. Los Angeles* (1940) 16 Cal.2d 779, 787 [108 P.2d 430].)

In a case decided after *Pac. Tel. & Tel. Co. v. City of Los Angeles, supra,* 44 Cal.2d 272, our Supreme Court held that a community television antenna was not subject to regulation by the Public Utilities Commission. (*Television Transmission v. Public Util. Com.* (1956) 47 Cal.2d 82 [301 P.2d 862].) The court cited the *Pacific Telephone* case, and said: "It does not follow, however, that because telephone corporations are not prevented by law from using their lines, which are unquestionably telephone lines, for the transmission of television broadcasts, any corporation that uses poles, wires, et cetera to transmit such broadcasts is a telephone corporation. It is not enough that there be a transmission by the use of poles, wires, et cetera; the transmission must be 'in connection with or to facilitate communication by telephone.' [Citation.]" (*Id.* at p. 87.)

The trial court relied on the *Television Transmission* case, and the subsequent case of *Pac. Tel. & Tel. Co. v. City & County of S. F.* (1959) 51 Cal.2d 766 [336 P.2d 514]. In the latter case, our Supreme Court held that "the construction and maintenance of telephone lines in the streets and other public places within the city is today a matter of state concern and not a municipal affair." (*Id.* at p. 768.) It said: "It is now settled that [former] section 536 of the Civil Code [now section 7901] constitutes 'a continuing offer extended to telephone and telegraph companies . . . which offer when accepted by the construction and maintenance of lines' [citation] gives a franchise from the state to use the public highways for the prescribed purposes without the necessity for any grant by a subordinate legislative body." (*Id.* at p. 771.) The court also noted that the telephone company provided communications services: "In addition to long distance, exchange and extended area telephone service, the communications services provided the public by the telephone company include private line telephone, teletypewriter, public mobile telephone, telephotograph, and the transmission of television and radio programs. In order to provide these communication services, the telephone company must maintain telephone lines in the streets located within the city." (*Id.* at pp. 772–773.) Although the types of services provided by Williams are different because of technological advances, the basic principle remains the same: regulation of such services is a matter of state concern. (*Id.* at p. 771.)

In a subsequent appellate court opinion involving the same controversy, the court disagreed with the contention that the franchise granted by former Civil Code section 536 did not include the placing of telephone wires under ground. (*Pacific Tel. & Tel. Co. v. City & County of San Francisco* (1961) 197 Cal.App.2d 133, 146–147 [17 Cal.Rptr. 687].) It said: "A sensible interpretation of [former Civil Code] section 536 is that it grants a franchise to telephone companies to construct and maintain in city streets the necessary equipment to enable the company to operate its business of providing communication for the people of the cities, the state, the nation and even foreign countries. The mere fact that in 1905 modern facilities were not in existence, should not prevent their use today, nor require an interpretation of the section which would require a telephone company to obtain an additional franchise therefor. As said in the opinion on the prior appeal concerning the concept of a 'municipal affair,' the facilities by which a telephone company operates its lines of communication are neither static nor fixed quantities 'but may fluctuate with changing conditions' and what may have been proper facilities a half century ago are not necessarily ones today. [Citation.] Because of its franchise, defendant is required to use the streets and other public places of San Francisco and other cities, and the people expect it to use the most modern equipment." (*Id.* at p. 147.) The same is true today, over 40 years later.

■ Thus, Williams established that it is a telephone company which provides telephone services. The bulk of its income is derived from telephone transmission services. The fact that other data is transmitted over the telephone lines does not deprive Williams of the protection afforded by section 7901. (*Pac. Tel. & Tel. Co. v. City of Los Angeles, supra*, 44 Cal.2d 272, 282.) Local franchises are prohibited because "[t]he undisputed evidence in this case discloses that all the communication services provided by the telephone company involve the transmission of intelligence by electrical impulses through its lines." (*Pac. Tel. & Tel. Co. v. City & County of S. F., supra*, 51 Cal.2d 766, 771.)

■ In our view, any uncertainty as to the extent to which a City could charge a telephone company a permit fee for the installation of telecommunications facilities was resolved by the California Telecommunications Infrastructure Development Act in 1996. The act adopted Government Code section 50030: "Any permit fee imposed by a city, including a chartered city, a county, or a city and county, for the placement, installation, repair, or upgrading of telecommunications facilities such as lines, poles, or antennas by a telephone corporation that has obtained all required authorizations to provide telecommunications services from the Public Utilities Commission and the Federal Communications Commission, *shall not exceed the reasonable costs of providing the service for which the fee is charged and shall not be levied for general revenue purposes.*" (Italics added.)

In adopting this section, the Legislature made the following findings and declarations: "(1) Connecting all California homes and businesses to the information superhighway has the potential to position the state on the leading edge of the telecommunications revolution. The emerging technologies will encourage economic growth and provide social benefits to all Californians, as well as allow California businesses and residents to compete in national and international markets. [¶] (2) Congress and the Legislature of the State of California have enacted telecommunications policies that include provisions to encourage the development and deployment of new technologies, and the equitable provision of services in a way that efficiently meets consumer need and encourages the ubiquitous availability of a wide choice of state-of-the-art services, and to promote economic growth, job creation, and the substantial social benefits that will result from the rapid implementation of advanced information and communications technologies. [¶] (3) New technologies require investment and expansion of telecommunications networks in order to bring greater choice to consumers by encouraging universally available telecommunications service. [¶] (b) The Legislature further finds and declares that this act does not constitute a change in existing law." (Stats. 1996, ch. 300, § 2.)

The trial court cited but misinterpreted this section when it concluded: "Government Code § 50030 does not prevent local agencies from charging rent or exacting franchise fees from telecommunications companies which install cables to be used for non-telephone purposes. This issue was not addressed by the legislation. [Citation.]"

The trial court cited a law review comment which examines the 1996 legislation and concludes that the Legislature was trying to define "the relationship between municipalities and telecommunications providers in the information age" and was also addressing the issue of the extent of local government control over deployment of advanced telecommunications services in their communities. (Comment, *As a Matter of Fact, I Do Own the Whole Damned Road: Municipal Impediments to Advanced Telecommunications Services Through Control of the Public Right of Way* (1997) 28 Pacific L.J. 947, 949 (Comment).) After discussing prior law, the author concludes: "Although the police power gives municipalities the authority to charge these kinds of fees, existing state law places limitations upon the amount that can be charged and the way it can be spent. For example, before a local government may impose a fee as a condition of approval of a development project, such as a project to install telephone wire in the streets of a city, the local government must show that there is a reasonable relationship between the amount of the fee and the cost of providing the facility for which the fee is charged. Thus, fees must be charged for a specified purpose, and not merely to raise general revenues." (*Id.* at pp. 952–953, fn. omitted.)[5]

Chapter 300, which enacted Government Code section 50030, was declaratory of existing law: "Before Chapter 300, it would have violated state law for a municipality to impose a fee for general revenue purposes that exceeded the cost of providing the service for which the fee is charged. The same is true after Chapter 300." (Comment, *supra,* 28 Pacific L.J. 947, 954, fn. omitted.)

The City does not attempt to justify the payment of $750,103 as a payment of the costs of installing conduit in the City's roadway.[6] Instead, it argues that the fee was not unilaterally imposed by the City but was, instead, consideration for a negotiated license agreement.

---

[5] The parties stipulated that the $750,103 payment was not deposited in a separate capital facilities account. Presumably, it was deposited in a general revenue account.

[6] The City's attorney specifically testified that the provision for the payment of $1.50 per foot of conduit was in addition to payment of City permit fees, all inspectors charges, and all expenses of refilling and repaving trenches. The City's trial attorney also conceded that section 7901 prohibits fees over and above reasonable costs.

The parties stipulated that minor charges ($38.50 or $55 per hour) were paid by other telephone companies for inspection services in the year 2000, and that, when administrative fees were charged, the amount was $110 per hour.

The evidence established, however, that the City would not grant the necessary permits without a license agreement, and would not enter into a license agreement without payment of the fee.[7] The City clearly stated that it was charging "a reasonable fee to use the City's rights of way . . . ." Its attorney said: "In earlier discussions it was conceded by Williams that it must pay a fee to traverse areas within the City that are not within the right of way. It is the City's contention that it may require a fee from Williams for areas within the right of way as well." Accordingly, the staff proposal to the City Council states: "[S]taff has negotiated a License Agreement for Underground Telephone Facilities with Williams Communications which provides for a one-time compensation payment from Williams for use of the street right-of-way totaling $759,050."

■ But the City is not legally permitted to impose such a charge on Williams. (Gov. Code, § 50030.) There was ample evidence that the charge was imposed on Williams without statutory authority. Indeed, the trial court found "that City did not purport to impose the subject license fee on plaintiff to mitigate or defray the cost of any alleged impacts on public improvements or facilities." Instead, the trial court specifically found that "The fees were charged based on what appears to have been the City's bald assertion that it could charge rent or an easement or license fee in consideration for such use of the City's streets." But a charge imposed for that reason was not legal or justifiable, and the trial court should have found that the provision of the license agreement calling for the payment of $750,103 was an illegal provision. In other words, the City could negotiate and enter into the license agreement, but it had no legal basis for charging Williams "compensation" for doing so.

## RECOVERY UNDER THE MITIGATION FEE ACT

The trial court found that the Mitigation Fee Act was not applicable to this case because Williams was not charged a mitigation fee within the meaning of Government Code sections 66000, subdivision (b), 66001, 66006, and 66020.[8]

---

[7] The City appears to concede that the license agreement was required: "Here, Williams took full advantage of the License Agreement by promptly installing its facilities in the rights-of-way under very favorable terms—a benefit that would not have been granted Williams absent the License Agreement."

[8] Unless otherwise indicated all statutory references in this part are to the Government Code.

Williams filed a claim under the Mitigation Fee Act and contends that the Act requires refund of the illegal consideration for the license agreement.[9] Specifically, it contends that its installation of conduit in City streets was a "development project," as defined in section 66020 and related sections, and that the illegal charge was a fee or other exaction under section 66020.

The primary sections in issue are sections 66021 and 66020. Section 66021, subdivision (a) states: "Any party on whom a fee, tax, assessment, dedication, reservation, or other exaction has been imposed, the payment or performance of which is required to obtain governmental approval of a development, as defined by Section 65927, or development project, may protest the establishment or imposition of the fee, tax, assessment, dedication, reservation, or other exaction as provided in Section 66020."

Section 65927 defines "Development" to mean: "on land, in or under water, the placement or erection of any solid material or structure; . . . construction, reconstruction, demolition, or alteration of the size of any structure, including any facility of any private, public, or municipal utility . . . . [¶] As used in this section, 'structure' includes, but is not limited to, any . . . conduit, [and] telephone line . . . ." Williams's project was clearly a development within this definition.

Section 66020, subdivision (a), provides: "Any party may protest the imposition of any fees, dedications, reservations, or other exactions imposed on a development project, as defined in Section 66000, by a local agency by meeting both of the following requirements: [¶] (1) Tendering any required payment . . . . [¶] (2) Serving written notice . . . ."

Section 66000 defines a "Development project" to mean "any project undertaken for the purpose of development. 'Development project' includes a project involving the issuance of a permit for construction or reconstruction, but not a permit to operate." Since the City required a permit for the development contemplated by Williams, the installation of conduit in City streets was a development project within the meaning of this section.

Accordingly, section 66021 authorizes Williams to claim a refund under the Mitigation Fee Act if the $750,103 was a "fee, tax, assessment . . . or other exaction . . . ." A fee is defined in section 66000, subdivision (b) as "a monetary exaction other than a tax or special assessment, whether established for a broad class of projects by legislation of general applicability or imposed on a specific project on an ad hoc basis, that is charged by a local agency to

---

[9] Williams also filed a claim under section 905. We do not consider the validity of that claim.

the applicant in connection with approval of a development project for the purpose of defraying all or a portion of the cost of public facilities related to the development project . . . ."

We agree with the trial court's conclusion that the $750,103 was not a fee within the meaning of this definition because it was not assessed for the purpose of defraying the cost of Williams's project. As the trial court found, the charge was "based on what appears to have been the City's bald assertion that it could charge rent or an easement or license fee in consideration for such use of the City streets."

Williams argues that, if not a fee, the charge was an "exaction" under sections 66020 and 66021. The statutes do not define "exaction" but the term is generally defined to include a "compensation arbitrarily or wrongfully demanded." (Black's Law Dict. (7th ed. 1999) p. 581, col. 2; Webster's 3d New Internat. Dict. (1993) p. 790, col. 2: "[T]he levying or demanding of some benefit (as a fee or gratuity) that is not lawfully or properly due.")

The Legislature's use of the term "other exaction" to include any unlawful charge is confirmed by a report of the Senate Rules Committee on Senate Bill 1896, the bill enacting the California Telecommunications Infrastructure Development Act. This report states that "Telecommunications companies fear that local officials might charge fees that are higher than their costs, using the evolving industry as a new source of revenue for their local general funds." Accordingly, the bill was designed to preclude all such charges, and to limit local fees to the reasonable cost of providing the service for which the fee was charged. If such fees are charged, "[b]uilders can protest the fees, ask for audits, and challenge them in court. The burden of proof falls on the local officials."

■ We therefore conclude that all charges in excess of the reasonable costs of providing the services are prohibited under section 50030, and the Legislature used the collective term "other exactions" in section 66020 to include all such charges. Our conclusion is reinforced by section 66021. Section 66021, by its reference to section 65927, clearly allows telephone companies to protest "other exactions" under section 66020 of the Mitigation Fee Act.

The trial court clearly misinterpreted the Mitigation Fee Act by holding that Williams could not use it to recover the illegal payment. We agree with Williams: "Under the court's reading of the statute, consequently, *no* illegal monetary charge would fall within the purview of the statute, yet the very purpose of the statute is to challenge the lawfulness of monetary charges imposed on persons who seek permits and licenses."

The trial court and the City rely on *Centex Real Estate Corp. v. City of Vallejo* (1993) 19 Cal.App.4th 1358 [24 Cal.Rptr.2d 48]. In that case, the City of Vallejo adopted an ordinance enacting a property development excise tax on developers as a condition of the issuance of a building permit. A developer argued that the tax was an invalid development fee. The trial court disagreed, finding that the "City had the right to tax developers for the privilege of developing or using property and that the purpose of the tax was to raise revenues for the City's general fund and not to fund the cost of public facilities or services related to a new development." (*Id.* at p. 1360.) The trial court also found that the ordinance did not conflict with the Mitigation Fee Act. (*Ibid.*)

The appellate court affirmed. Relying on the express language of section 66000, the court found that a tax is excluded from the requirements of section 66000 et seq. The court therefore found that the Mitigation Fee Act does not prohibit the City from enacting the excise tax. "An excise tax may properly be imposed on the privilege of developing property. [Citation.]" (*Centex Real Estate Corp. v. City of Vallejo, supra,* 19 Cal.App.4th 1358, 1364–1365.) Accordingly, it was not a development fee, and was valid because it did not conflict with a state statute. (*Id.* at p. 1365.)

While we do not disagree with *Centex*, it has limited applicability here because the exaction here was not a tax. Instead, it was "compensation" charged for the use of the City streets. But, as discussed above, such charges cannot exceed the reasonable costs of providing the service for which the fee is charged. (§ 50030.) In other words, the City of Vallejo in *Centex* had the right to impose an excise tax on the privilege of developing property. But Riverside did not have the right to require Williams to pay $750,103 to use the City's streets for its conduits. (Pub. Util. Code, § 7901; Gov. Code, § 50030.)

As discussed above, the City argues that the Mitigation Fee Act only applies to fees, and not anything else. This argument derives from the definition of fee in section 66000. While we agree with the trial court and the City that the payment was not a fee, as defined in section 66000, subdivision (b), it was an "other exaction" as defined in sections 66020 and 66021. Because the sum charged was an "other exaction," the Mitigation Fee Act is applicable.[10]

The City strenuously argues that sections 66020 and 66021 are inapplicable because the city did not "impose" the charge on Williams. The City contends

---

[10] The City also argues that the Mitigation Fee Act is inapplicable because Williams allegedly failed to comply with section 66024. That section requires a person challenging the imposition of a development fee to meet certain requirements. However, the section only applies to cases which raise the issue of whether the development fee is a special tax. That was not the issue here, and Williams did not have to comply with that section.

that the charge was a negotiated sum which compensated the City for giving up certain bargaining positions over potential issues. Even if the amount was negotiated and Williams tried to negotiate the fee lower, the fact remains that the City required payment of $750,103 as part of the consideration for the license agreement. Since the payment was required as a condition of the license agreement, and the license agreement was required before the necessary permits would issue, we must conclude that the payment was imposed on Williams.[11]

Stripped to its essentials, the trial court held that the Mitigation Fee Act was inapplicable because the charge was based on the City's "bald assertion that it could charge rent or an easement or license fee in consideration for such use of the City's streets." But we have found that the "bald assertion" had no legal basis. We have also found that the illegal charge was an "other exaction" which allowed Williams to contest the charge under sections 66020 and 66021. Having pursued the proper procedural remedy, and having shown that the charge was illegal, Williams was entitled to recover the balance of the charge from the City.

## ATTORNEY FEES

Williams also appeals from the trial court's attorney fees order. In that order, the trial court determined that the City was the prevailing party. It cited the attorney fees provision in the license agreement and it awarded the City $212,861 in attorney fees pursuant to that provision.[12] (Civ. Code, § 1717.)

In the trial court, Williams argued that attorney fees should not be awarded because it was the prevailing party and because its action was not an action on the contract. The trial court rejected these arguments. On appeal, Williams again advances these arguments to invalidate the trial court's award of attorney fees to the City.

Since we have concluded that the charge of $750,103 was illegal, and that Williams is entitled to recover it under the Mitigation Fee Act, the trial

[11] The City argued at trial that the charge was not imposed because only the City Council had authority to impose a fee. But the City Council approved the agreement which required Williams to pay compensation greater than the cost of providing services for which the fee is charged, in violation of section 50030. The City's attorney testified that a license agreement was required and there was no evidence that city staff or the City Council would have approved a license agreement without charging compensation. As the City's attorney stated during negotiations, "[T]he City believes a reasonable fee to use the City's rights of way entails a one time payment of $776,160 at $1.50 per foot per conduit." In addition, the City Council violated section 50030 by using the money as general revenue.

[12] The license agreement states: "If any action is brought to enforce or interpret any provision of this License, the prevailing party shall be entitled to reasonable costs and attorneys fees."

court's attorney fees order must also be reversed. Williams is now the prevailing party, but an issue remains as to whether it is entitled to recover its attorney fees under Civil Code section 1717.

Since this action was brought to establish the invalidity of the payment called for in the license agreement, we agree with the trial court that Williams was at least seeking an interpretation of the license agreement. It also sought interpretation or invalidation of other terms of the agreement, such as the provision for a 35-year term. Accordingly, upon reversal, the attorney fees provision of the license agreement would normally be applied and Williams would be the prevailing party who would be entitled to recover its attorney fees in accordance with the attorney fees provision of the license agreement.

But Williams has argued that the attorney fees provision of the license agreement is inapplicable. Presumably, it will on remand change its position and argue that it should receive its attorney fees in accordance with the license agreement. The City would respond by arguing that Williams cannot reverse its position and that it has waived its right to recover attorney fees under the provisions of the license agreement.

Williams also seeks to recover its attorney fees under Code of Civil Procedure section 1021.5. However, it does not provide any analysis or argument under that section, and we do not decide whether or not it is entitled to a recovery of its attorney fees under that section.

In this posture, we merely reverse the trial court's order granting attorney fees to the City and direct the trial court to reconsider the entire issue of an attorney fees award on remand. In view of our decision on the merits, the City's cross-appeal, which sought additional attorney fees, is moot.

## OTHER ISSUES

Williams argues that it is entitled to recover interest on the money withheld by the City. Section 66020, subdivision (e) of the Mitigation Fee Act requires the court to refund the unlawful portion of the payment with interest at the rate of 8 per percent per annum. The trial court is directed to make an appropriate order under this subsection.

Williams also attacks a provision in the license agreement which states that the term of the agreement is 35 years. The provision also states: "Expiration of the term of this License shall be without prejudice to any legal rights Licensee may have under Public Utilities Code Section 7901 or other applicable law to continue use of the Licensed Premises for the Telecommunications Facilities." Since we have agreed with Williams that it has the right

to use the City's streets under section 7901, we agree with its argument that the City cannot limit the exercise of that right to a specific term. Accordingly, that provision of the license agreement is also invalid and unenforceable.

The City argues that Williams waived its right to sue the City under section 17 of the license agreement. That section provides: "In consideration for the granting of this License, Licensee hereby expressly waives any and all rights, claims, loss, damage or action against City resulting from . . . any lawful action of City, its officers, agents or employees taken in accordance with the terms of this License." We find no such waiver here because the action of the City in charging $750,103 for the use of the City streets was not a lawful action of the City.

## DISPOSITION

The judgment is reversed and the case is remanded to the trial court with directions to enter judgment for Williams on its complaint for $393,324 ($750,103 minus $356,779) plus interest as provided in section 66020, subdivision (e).[13] The trial court is also directed to determine whether Williams is entitled to recover its attorney fees under the license agreement or pursuant to Code of Civil Procedure section 1021.5 or as otherwise provided by law. Williams is to recover its costs on appeal.

Ramirez, P. J., and Ward, J., concurred.

The petition of defendants and appellants for review by the Supreme Court was denied April 14, 2004.

---

[13] Williams is also not precluded from arguing that it is entitled to interest on the sum of $356,779 from date of payment to date of refund. We express no opinion on that issue.