[No. G044796. Fourth Dist., Div. Three. Mar. 14, 2013.]

CITY OF HUNTINGTON BEACH, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
CROWN CASTLE NG WEST, INC., Real Party in Interest.

## COUNSEL

Jennifer McGrath, City Attorney, and Scott F. Field, Assistant City Attorney, for Petitioner.

Frank R. Lindh, Helen W. Yee, Dale Holzschuh and Hien C. Vo Winter for Respondent.

Davis Wright Tremaine, T. Scott Thompson, Daniel P. Reing, Martin L. Fineman and Suzanne K. Toller for Real Party in Interest.

## OPINION

**IKOLA, J.**—Public Utilities Code section 7901[1] grants "telephone corporations" the privilege to construct infrastructure upon public rights-of-way, subject to a municipality's "right to exercise reasonable control as to the time, place, and manner in which roads, highways, and waterways are accessed" (§ 7901.1, subd. (a)). In the proceeding under review, the Public Utilities Commission (commission or PUC) classified NextG[2] as a telephone corporation and approved NextG's proposed construction project in the City of Huntington Beach (the City).

The City is opposed to aspects of NextG's project. As its first line of defense to the NextG project, the City asserts that NextG is a wireless provider and therefore not a telephone corporation. The City contends that the definition of "telephone corporation" for purposes of section 7901 does not include wireless providers, as opposed to traditional landline providers. But in

---

[1] Unless cited otherwise, all statutory references are to the Public Utilities Code.

[2] The real party in interest is now known as Crown Castle NG West, Inc., but was known as NextG Networks of California, Inc., at the time of the PUC proceeding.

our view, the commission correctly interpreted and applied the Public Utilities Code in designating NextG as a telephone corporation entitled to the privileges of section 7901.

As its second line of defense to the NextG project, the City relies on municipal ordinances requiring, subject to exceptions, the undergrounding of wires and other communications equipment. The City claims the commission erred by purporting to "preempt" local ordinances in approving NextG's construction project in the City. We agree with this contention. Throughout the PUC proceedings, the parties and the commission emphasized that a court, not the commission, would adjudicate the validity of the City's municipal ordinances. The commission exceeded the scope of the proceedings when it ruled, via a modification to its initial decision, that its approval of NextG's project preempted local ordinances

We therefore affirm in part commission decisions D.10-10-007 (the October 2010 initial decision) and D.11-01-027 (the January 2011 rehearing decision), but reverse and set aside those portions of the decisions purporting to preempt local ordinances. (§§ 1758, subd. (a) [appellate court "shall enter judgment either affirming or setting aside the order or decision"], 1759, subd. (a) [providing jurisdiction to reviewing court to "reverse" PUC orders and decisions].)

FACTS

NextG builds and owns fiber optic networks. However, NextG does not directly serve individual customers whose calls are carried over NextG's networks. Instead, NextG sells capacity on its networks to other companies, who use the capacity to serve their end-use customers. NextG is thus a "carrier's carrier."

The project at issue is "the completion of [a distributed antenna system] within the City . . . . The . . . communications network is intended to transmit wireless voice and data communications to clients in the City" (the Project). The Project includes aerial fiber cable and underground fiber cable. Part of the Project already has been constructed under previously granted authority. NextG's customer for the Project is MetroPCS, a company that provides commercial mobile radio service to its customers.

NextG's regulatory status with the PUC and the history of the dispute between NextG and the City are relevant to our review. This summary chart of the PUC proceedings mentioned in this opinion may be useful as a reference point.

| Date | Decision No. | Summary |
|------|--------------|---------|
| Jan. 2003 | D.03-01-061 | NextG's certificate of public convenience issued |
| Apr. 2007 | D.07-04-045 | Amended certificate issued |
| July 2007 | D.07-07-023 | Rehearing of April 2007 decision |
| Oct. 2010 | D.10-10-007 | Initial decision at issue in this proceeding |
| Jan. 2011 | D.11-01-027 | Rehearing of October 2010 decision |

*The January 2003 Decision (D.03-01-061)*

In January 2003, the commission issued a certificate of public convenience and necessity to NextG, which authorized NextG "to provide limited facilities-based and resold local exchange, access and interexchange telecommunications services." The authorization was conditioned on NextG complying with various rules applicable to its class of competitors. NextG's application was uncontested.

The commission issued the certificate under the authority of section 1001, which provides in relevant part, "No . . . telephone corporation . . . shall begin the construction of . . . a line, plant, or system, or of any extension thereof, without having first obtained from the commission a certificate that the present or future public convenience and necessity require or will require such construction." It is implied in the issuance of a certificate under section 1001 that the PUC considered NextG to be a "telephone corporation," but the January 2003 decision did not explicitly address this question.

*The April 2007 Decision (D.07-04-045)*

In April 2007, the commission issued a decision granting NextG's "request for full facilities-based local exchange services authority and expedited environmental review" like that previously authorized for firms engaged in similar activities. This expansion of NextG's authority was necessary for it to engage in "(1) new pole installations, (2) small-scale trenching and underground conduit installation, and (3) micro-trenching and installation of laterals."

The commission also approved the use of its previously developed expedited CEQA[3] review process for individual NextG projects. NextG would submit a description of the proposed project to the CEQA staff in the "Energy Division" of the PUC, with all necessary documentation required to support the project's fast-track approval under CEQA.

---

[3] CEQA stands for the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.).

With regard to the issue of "utility poles in underground districts," the commission ruled that "the procedure we adopt here will apply to installing utility poles in underground districts where local jurisdictions grant such exceptions." The April 2007 decision did not purport to preempt all local ordinances that would limit NextG's ability to engage in groundbreaking activities. Indeed, in denying NextG's petition for rehearing of the April 2007 decision, the commission observed: "We are aware that the California Constitution does provide this Commission with preemptive authority over local jurisdictions with respect to the regulation of utilities. At the same time, the Constitution provides cities the power to make and enforce local ordinances and regulations not in conflict with general laws. The process adopted in [the April 2007 decision] is consistent with long standing Commission policy to recognize local government concerns and require utilities to accommodate local land use requirements in constructing their facilities." (*In re Application of NextG Networks of California, Inc.* (July 12, 2007) Cal.P.U.C. Dec. No. 07-07-023, p. 6 [2007 Cal.P.U.C. Lexis 286], fns. omitted (the July 2007 decision).)

*NextG's Application to the City*

In March 2006, NextG formally applied to the City for authorization "to conduct business as a telecommunications company operating with infrastructure located in the . . . public ways." NextG requested "a non-exclusive right-of-way agreement or other appropriate form of authorization . . . in order to install, operate, and maintain fiber optic cable and associated equipment, including optical repeaters and antenna facilities, on, over, and under the public way . . . in connection with the provision of telecommunications provided by NextG as a carrier's carrier to its wireless carrier customers."

The City did not readily accede to NextG's requests. As of September 2007, NextG's representative professed to be "disappointed and frustrated" with the City. Although further discussion continued (as evidenced by written communications), NextG and the City were unable to resolve their differences. The City took the position that pertinent local ordinances precluded aspects of the Project, which called for the construction of new utility poles and aerial lines.

*Pertinent Local Ordinances*

In 1977, the City adopted ordinance No. 2222, adding chapter 17.64 to its Municipal Code, commonly referred to as the "Undergrounding Ordinance." The City cites various portions of the Undergrounding Ordinance as pertinent to its refusal to allow NextG unfettered access to the public right-of-way

in the City. Pursuant to Municipal Code section 17.64.050, which was amended in 2007, "All new public and private utility lines and distribution facilities . . . shall be installed underground," subject to certain exceptions. Municipal Code section 17.64.130 lists exclusions "from the provisions of this chapter unless otherwise provided in the resolution designating the underground utilities district," including "(f) Antennas used by a utility for furnishing communication services." The City contends this exclusion "permits attaching antennas to existing, pre-1977 utility poles, but any equipment or facilities accessory to an antenna must be installed underground."

Also of note to this opinion is the City's so-called "Wireless Ordinance," which consists of chapter 230.96 of the City's Zoning and Subdivision Ordinance. As its name implies, the Wireless Ordinance regulates the deployment of wireless communications equipment in the City.

*PUC Energy Division Proceedings*

On November 12, 2007, NextG submitted a notice of proposed construction to install a distributed antenna system on behalf of MetroPCS in the City. The notice requested the Energy Division to determine that the Project was categorically exempt from CEQA. On December 3, 2007, the Energy Division found the Project categorically exempt from CEQA, and issued a notice to proceed with construction. The City objected to the notice to proceed and it was suspended by the Energy Division. According to the Energy Division, the City submitted three concerns: "1) the accuracy of the project description; 2) the Energy Division's conclusion that the project is categorically exempt from CEQA; and, 3) the installation of overhead equipment in an underground utility district."

On March 14, 2008, the Energy Division, "[u]pon review of the full administrative record," concluded that "NextG's project description . . . is accurate and complete. Upon review of the complete project description, the Energy Division finds that the project is consistent with the activities identified by the Commission as categorically exempt under CEQA and no further environmental review is required." With regard to "the installation of overhead equipment in an underground utility district," the Energy Division simply noted a district court injunction, described in the next part of the recitation of facts in this opinion. The Energy Division did not purport to address the applicability or enforceability of the Undergrounding Ordinance or Wireless Ordinance. On March 17, 2008, the Energy Division authorized NextG to proceed with the construction of the Project.

*Federal Action*

On December 27, 2007, NextG sued the City in federal court, in a case styled *NextG Networks of California, Inc. v. City of Huntington Beach* (C.D.Cal., Feb. 7, 2008, No. SACV 07-1471 ABC) (the Federal Action). The district court issued injunctions in February and March 2008, enjoining the City from (1) enforcing its Undergrounding Ordinance or Wireless Ordinance so as to prevent NextG from fulfilling its contractual obligations, or (2) enforcing its ordinances against NextG in a manner inconsistent with the City's enforcement vis-à-vis incumbent telecommunications and cable television providers.

Pursuant to the injunctions issued against the City in the Federal Action, the City issued encroachment permits authorizing NextG to install seven of the 15 antennas constituting the Project pursuant to a new set of construction plans on May 14, 2008. Since those seven antennas and related lines and equipment were completed on or about September 27, 2008, no further work has been performed on the Project. The Project stalled because, in September 2008, the injunctions were vacated on appeal and the Federal Action was remanded to the district court for further proceedings. (*NextG Networks of California, Inc. v. City of Huntington Beach* (9th Cir. 2008) 294 Fed.Appx. 303.)

*The City's Complaint*

In April 2008, the City filed a complaint against NextG with the PUC. The City made three claims. First, the City alleged that the Energy Division erred by approving NextG's Project under a CEQA categorical exemption (Cal. Code Regs., tit. 14, §§ 15300–15333). This is a pure CEQA issue over which this court has no jurisdiction, as explained below.

Second, the City alleged that the Undergrounding Ordinance "prohibits NextG from installing 3 of its proposed 15 antennas, and may [prohibit the] installation of a fourth antenna, if the pole to replace the existing pole in order to accommodate the antenna is taller and materially different than the existing pole." The City referenced the April 2007 decision, in which the commission stated with regard to the issue of "utility poles in underground districts" that "the procedure we adopt here will apply to installing utility poles in underground districts where local jurisdictions grant such exceptions." The City took issue with the Energy Division's issuance of a notice to proceed with NextG's Project following an expedited CEQA review despite the fact that the Undergrounding Ordinance prohibited the installation of new utility poles. The City requested that the commission invalidate the notice to

proceed with NextG's Project and "declare that NextG does not have authority to install new poles, antenna, or aerial fiber optic cable facilities in the public rights-of-way."

Third, the City alleged that NextG cannot be a "telephone corporation" as a matter of law and therefore cannot be eligible to use public rights-of-way under section 7901. The City reasoned that NextG is a wireless provider and "[o]nly land line telephone carriers are 'telephone corporations.' " The City requested that the commission "declare as a matter of law that NextG is not a telephone corporation within the meaning of Section 7901" and that "NextG has no right to use the public right-of-way within the City . . . ."

*NextG's Motion to Dismiss the City's Complaint*

In June 2008, NextG filed a motion to dismiss the City's complaint, which argued on various grounds that the complaint was procedurally improper and substantively without merit.

In November 2008, in a joint ruling from an assigned commissioner and administrative law judge, NextG's motion was granted in part and denied in part. The joint ruling granted the motion to dismiss as to the City's third cause of action, i.e., that NextG is not a telephone corporation. According to the ruling, the plain language of the relevant statutes as well as previous commission decisions compelled this result. The joint ruling denied the motion as to the other two causes of action.

*Parties' Stipulation*

In December 2008, the parties submitted a stipulation to the PUC, setting forth an agreed-upon procedure and narrowing the issues in dispute. "Instead of pursuing Project approval by way of a [notice to proceed], and to resolve the remaining issues in dispute between the Parties in this Complaint Proceeding, NextG shall file a Proponent's Environmental Assessment . . . and request Commission authorization for the Project that reflects NextG's current Project plan. . . . The Parties request that the Commission prepare a negative declaration, mitigated negative declaration or environmental impact report for the Project."

"The Parties agree that the following issues are . . . the only issues that remain in dispute . . . : A. Whether the Ruling dismissing the City's third cause of action should be affirmed or reversed by the full Commission; B. Whether the Commission should certify the environmental document for the Project, and if so, what if any mitigation measures may be required; and C. Whether the Commission should approve the Project." (Italics omitted.)

Importantly, the parties stipulated that the validity of any City ordinance would not be resolved by the commission: "This proceeding will not adjudicate the validity of the City's Undergrounding Ordinance, Wireless Ordinance, or other ordinances or regulations . . . . Consequently, if approved by the Commission, the approval of NextG's Project and certification of a Negative Declaration, Mitigated Negative Declaration, or Environmental Impact Report for the Project under CEQA shall not exempt or excuse NextG from complying with any and all valid local ordinances or regulations, including, but not limited to, the City's Undergrounding Ordinance, Wireless Ordinance or other ordinances or regulations. NextG may challenge the validity of any such ordinances or regulations in any federal or state court of law. NextG is currently challenging the validity of the City's Undergrounding Ordinance in the [Federal] Action."

*Initiation of State Court Action*

In February 2009, the district court in the Federal Action granted the City's motion for judgment on the pleadings with regard to NextG's federal claims and declined to exercise jurisdiction over NextG's state law claim, "specifically whether . . . Sections 7901 and 7901.1 preempt the City's ordinances." The district court did not order the removal of the part of the Project already installed, but directed NextG to either apply for City approval of its Project or seek relief in state court.

On March 6, 2009, NextG filed *NextG Networks of California, Inc. v. City of Huntington Beach* (Super. Ct. Orange County, 2012, No. 30-2009-00119646) (the State Court Action).[4] NextG sought declaratory and injunctive relief. NextG's first cause of action alleged that "[t]he terms and conditions that the City imposes in the rules, regulations, and requirements in the City's Code, including but not limited to those identified in the Wireless Ordinance and Undergrounding Ordinance, on their face and as applied to NextG and NextG's deployment of its facilities in the public rights-of-way, exceed the scope of the City's authority under and are preempted by Section[s] 7901 [and 7901.1]." NextG's second cause of action made similar allegations but on the specific ground that the City has discriminated against NextG as compared to "incumbent providers" of telecommunications services. NextG's third cause of action alleged that the City, in violation of Government Code section 56030, seeks to improperly require NextG to pay permit fees in excess of the reasonable costs incurred by the City for providing services to NextG.

---

[4] On our own motion, we take judicial notice of the complaint in this action. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

*NextG's PUC Application*

On March 3, 2009, NextG filed an application with the PUC to "confirm the authority" it had received from the commission to construct the Project, and to have the commission review NextG's environmental assessment, an approximately 200-page document.

NextG explained in its application that it had completed the majority of the Project pursuant to the notice to proceed issued by the Energy Division, but that the City had refused to permit the completion of the construction. NextG requested in the application "that the Commission address . . . [the City's] assertion that additional portions of the Project should be undergrounded in compliance with its local ordinances by conditioning approval of the Project on compliance by NextG with any lawful local ordinances and regulations." Importantly, the application stated that "the applicability and lawfulness of these ordinances to the Project is now at issue in pending litigation between the parties. The [parties] have stipulated that . . . the scope of the [PUC] proceeding 'will not adjudicate the validity of' " the City's ordinances.

The City filed a protest to NextG's application: "NextG's Application proposes a Project in violation of City Ordinances. The City contends that in light of NextG's pending State Court lawsuit testing the validity of the City's Ordinances, this Application should be stayed until that lawsuit is final. For the Commission to consider a Project that violates local regulations is a pointless exercise, particularly where the parties have already agreed that State suit is the proper forum to determine the validity of the City Ordinances." The City accused NextG of "attempting to have it both ways, litigating preemption in the State Court Action and determining whether NextG must comply with City regulations through this Application."

NextG responded in a subsequent filing. "Let there be no mistake about it: NextG has NOT requested that the Commission make a determination regarding 'whether NextG must comply with City regulations' through its Application. In fact, in conformance with the Stipulation of the Parties, NextG has specifically requested that the Commission not address the validity of the City's regulations. As noted in its Application, NextG requests that the Commission simply address the City's 'local ordinances by conditioning approval of the Project on compliance by NextG with any lawful local ordinances and regulations.' " "[T]he Commission could not meaningfully evaluate whether NextG's Project complies with 'lawful' local ordinances until after the State Court has held whether the City's ordinances are lawful."

*Scoping Memorandum*

In July 2009, the assigned commissioner and administrative law judge issued a joint ruling setting the schedule for the commission proceeding and

determining the scope of the proceeding. The ruling "recategorize[d] the consolidated proceeding as ratesetting and determine[d] that an evidentiary hearing [was] not necessary."[5] An evidentiary hearing was unnecessary because, as to environmental issues, the City would have the opportunity to submit evidence as part of the commission's environmental review of the process. Moreover, the joint ruling determined that the question of whether the Project complies with local ordinances is a matter of law, as the Project will be fully described in the environmental document it produced.

The joint ruling recognized that NextG was seeking authorization to complete its Project. Although most of the Project had already been constructed, several aspects of the Project had not been completed, including the installation of overhead aerial fiber, underground fiber optic cable, and three new poles. The joint ruling described the scope of the consolidated proceeding before the PUC as including a number of issues related to the Project's environmental impact, and also whether NextG is a telephone corporation.

The scoping memorandum also stated "[t]his proceeding will not adjudicate the legal validity of [the City's] undergrounding ordinance, wireless ordinance, or other ordinances or regulations adopted by" the City. In a subsequent trial brief, NextG emphasized this limitation on the scope of the proceeding: "[T]he Application does not ask that the Commission decide the validity of the undergrounding issue and the City has specifically stipulated that the Commission will not address this legal issue. In this respect it is significant that NextG's Application does not request that the Commission preempt the City's undergrounding ordinance—although the . . . PUC clearly has the authority to do so. Instead NextG—with the agreed stipulation of the City—has left that issue for the Courts to decide."

*Negative Declaration*

In February 2010, a document entitled "Final Initial Study and Negative Declaration" was completed by the Energy Division. This document concluded that "the project as proposed by NextG . . . would have no significant impacts in the areas of aesthetics, agricultural resources, air quality, biological resources, cultural resources, geology and soils, hazards and hazardous materials, hydrology and water quality, land use and planning, mineral resources, noise, population and housing, public services, recreation, transportation and traffic, and utilities and service systems." In the land use and

---

[5] Proceedings can be classified as either adjudicatory, ratesetting, or quasi-legislative. (Cal. Code Regs., tit. 20, § 1.3, subd. (b).) "When a proceeding does not clearly fit into any of the categories . . . the proceeding will be conducted under the rules applicable to the ratesetting category . . . ." (Cal. Code Regs., tit. 20, § 7.1, subd. (e)(2).) Notwithstanding the use of the word "ratesetting," it does not appear that NextG's "rates" were at issue in this proceeding.

planning section of the report, it was indicated that the Project would have a "[l]ess than significant impact" with regard to conflicts with applicable land use plans, policies, or regulations within the applicable jurisdiction.

As to the Undergrounding Ordinance and Wireless Ordinance, the report stated: The Project "has been modified to underground the new fiber-optic cable network wherever existing aboveground utility lines do not currently exist and to the extent feasible. The project includes adding one additional overhead cable where existing overhead utilities occur, along the existing publicly owned right-of-way, and adding three new poles also within the existing publicly owned right-of-way. The project would not result in a significant change from existing conditions and is not considered to be a substantial conflict with" the ordinances.

*The October 2010 Initial Decision (D.10-10-007)*

In October 2010, the commission reached the merits of the issues presented. The commission explained that, pursuant to the parties' stipulation, it would determine only three issues: (1) whether the City's cause of action pertaining to the status of NextG as a telephone corporation was properly dismissed; (2) whether the commission should certify the environmental document prepared for the Project proposed by NextG; and (3) whether the commission should "approve the project" proposed by NextG.

First, with regard to the question of whether NextG was a " 'telephone corporation,' " the commission affirmed the prior joint ruling "as to both its reasoning and its result." "We hold that NextG is now, and has been continuously since we granted its first [certificate of public convenience and necessity], a 'telephone corporation' within the meaning of . . . [the Public Utilities Code]. We necessarily determined this issue when we granted each [certificate] . . . ." "As well stated in the Joint Ruling that we affirm today, the plain language of the statutory definition of 'telephone line' is sufficiently broad to include facilities and equipment installed by carriers in connection with or to facilitate both wireless and landline telecommunications services. The plain language also suggests the Legislature intended to include a broad range of technologies within the definition of 'telephone line.' " Finally, the commission noted that in other proceedings it had made clear that all competitive local exchange carriers and interexchange carriers (of which NextG is an example) are telephone corporations.

Second, the commission approved the negative declaration prepared in connection with NextG's proposed Project. The commission rejected the City's argument that violation of its local ordinances compelled a different result under the commission's CEQA analysis. The commission stated, "what

does (or does not) constitute a significant effect on the environment is defined under CEQA and the CEQA Guidelines. [The City] has not shown that CEQA law, or any judicial interpretation of the law, compels the finding that inconsistency with local ordinances is, in itself, a significant environmental effect. Our independent judgment and analysis confirms that NextG's project will not have such an effect." The commission added, "In adopting the Final Negative Declaration, we do not make any determination as to the validity of [the City's] ordinances, nor as to the compliance of NextG's project with these ordinances. Moreover, we do not purport to pre-empt these ordinances. The consequence of any noncompliance (beyond what we have concluded above with respect to CEQA) is a subject for another day, and another forum."

Third, the commission approved NextG's application and authorized NextG to construct its Project. In doing so, the commission concluded the Project would not "have a significant impact on the environment," and that the Project was "consistent with, and authorized by," the previously issued certificates of public necessity and convenience. "Our approval does not relieve NextG from obtaining such local permits or complying with such other requirements as may lawfully be imposed under [section] 7901.1."

The commission added that the scoping memorandum had "correctly rejected [the City's] request for an evidentiary hearing. There are no material factual issues in dispute; rather, the controversy concerns the legal consequences that follow from facts that, in all material respects, are not disputed."

*The January 2011 Rehearing Decision (D.11-01-027)*

In November 2010, the City applied for rehearing of the October 2010 initial decision. The City raised four contentions: (1) the PUC lacked jurisdiction to determine that NextG is entitled to use public rights-of-way pursuant to section 7901; (2) NextG is a wireless carrier (rather than a telephone corporation) and therefore ineligible to utilize public rights-of-way pursuant to section 7901; (3) NextG's Project violates the Undergrounding Ordinance and therefore should be prohibited because NextG was ordered in (the July 2007 decision) to comply with local land use requirements; and (4) the negative declaration should be rejected because a fair argument can be made that the Project will have a significant environmental impact.

In response, the commission issued the January 2011 rehearing decision, which rejected each of the City's contentions but modified the October 2010 initial decision to insert additional analysis. As to the first two arguments, the commission repeated its prior analysis with regard to the statutory definition of telephone corporation and the applicability of this definition throughout the

Public Utilities Code. The commission added that it has the exclusive jurisdiction to grant certificates of public convenience and necessity to public utilities, including telephone corporations. (§ 1001.) The commission rejected the argument that it lacked jurisdiction to classify an entity as a telephone corporation entitled to the benefits of section 7901. The commission explained that its decision was consistent with prior PUC practice, in that NextG "may . . . use the [certificate of public convenience and necessity] to enforce its rights pursuant to section 7901. If the local government body refuses to grant access in accordance with the Commission order . . . , [NextG's] recourse shall be to file a lawsuit in the appropriate court of civil jurisdiction seeking resolution of the dispute over access [citation], which NextG has done. The Decision in this case does not order the City to grant access to NextG; rather it merely confirms the Commission's prior [certificate] decisions."

The fourth argument (pertaining to compliance with CEQA) is outside our purview. The commission rejected the argument, concluding the City "failed to support a 'fair argument' that the NextG project may have a significant environmental impact."

With regard to NextG's third argument (viz., project approval was in conflict with the City's ordinances), the commission switched course from its initial decision. The commission ordered two modifications to the October 2010 initial decision, inserting analysis and a conclusion of law stating that the City's ordinances are preempted to the extent they are inconsistent with the commission's approval of the Project. We quote the relevant analysis in detail. "Although the City is correct that a portion of the NextG construction is inconsistent with its undergrounding ordinance, the approved installation is still within the scope of NextG's [certificate of public convenience and necessity]." The October 2010 initial decision "does not explicitly discuss whether the NextG installation is consistent with the City's undergrounding ordinance. The City and NextG stipulated that the 'Proceeding will not adjudicate the validity of the . . . Undergrounding Ordinance.' [Citation.] However, at the same time, the parties stipulated that the proceeding should determine 'whether the Commission should certify the environmental document for the Project' as well as 'whether the Commission should approve the Project.' [Citation.] Some consideration of the ordinance is necessarily within the scope of our approval and review of the NextG installation because CEQA contemplates that an agency will review applicable land use regulations. [Citation.] Although the City does not mention the [negative declaration] discussion in its current challenge, the [negative declaration], following the [CEQA] Guidelines checklist, considers the undergrounding ordinance and determines that the project is consistent with the ordinance."

"Under the plain terms of the stipulation, the Commission necessarily must evaluate the validity of the ordinance to the limited extent that it impacts the Commission's review and approval of the project. Moreover, in its application for rehearing [citation], as well as in its comments during the proceeding, the City has squarely raised the issue of whether its undergrounding ordinance conflicts with NextG's project. [¶] The City is correct that a small portion of the NextG installation is inconsistent with its undergrounding ordinance. This is contrary to the conclusion reached in the [negative declaration]. [The Undergrounding Ordinance] forbids new above-ground poles, with certain exceptions not applicable here. Although there have been questions about whether the City has applied the ordinance consistently, it is clear that the literal wording of the ordinance does not permit NextG's installation. At the same time, *because utilities may need to construct above-ground poles to house antennas, the statewide interest in public utility service preempts this ordinance in the event of a conflict, as is the case here.*" (Italics added.)

"Although [the October 2010 initial decision] does not specifically rule on the undergrounding ordinance, it adopts the [negative declaration], and therefore, the [negative declaration] findings. We will modify the [negative declaration] to correct the statements that the project is consistent with the City's ordinance. Although there is indeed a conflict with the ordinance, this does not impact the viability of the project because utility regulation is a statewide concern, and the Commission has the authority to preempt local ordinances that are inconsistent with its regulation. [Citation.] In addition, we will modify the language in the decision to clarify that we are preempting the City to the extent that the ordinance is inconsistent with the NextG project the Commission is now approving." The decision added that because the commission provided a full review of the Project (rather than expedited CEQA review with the Energy Division), NextG was authorized under its certificate of public convenience and necessity to complete its Project.

*The City Petitions for Writ of Review*

On February 14, 2011, the City petitioned this court for a writ of review of the October 2010 initial decision and the January 2011 rehearing decision. On June 15, 2011, this court ruled that the petition violated Public Resources Code section 21168.6[6] to the extent it raised CEQA issues. We also, however, granted the City's request for leave to file an amended petition limited to non-CEQA issues.

---

[6] "In any action or proceeding [to review a CEQA determination, finding, or decision] against the Public Utilities Commission the writ of mandate shall lie only from the Supreme Court to such commission." (Pub. Resources Code, § 21168.6.)

*Subsequent Proceedings in State Court Action*

In February 2011, the trial court in the State Court Action denied the parties' respective motions for summary judgment and/or summary adjudication, except the court granted NextG's motion for summary adjudication on its third cause of action. The trial court held it was bound by the PUC's interpretation of "telephone corporation," which could only be reviewed by the Court of Appeal or the California Supreme Court. The court's order did not discuss preemption of the local ordinances. Thus, the State Court Action was ready to proceed to trial on the other two causes of action pertaining to whether the City's Undergrounding Ordinance or Wireless Ordinance could be enforced despite NextG's asserted right under section 7901 to use the public right-of-way.

On April 4, 2011, the City petitioned this court for a writ of mandate, prohibition, or other extraordinary relief with regard to the State Court Action. The City argued a writ and stay of the trial were necessary to stop a trial on the preemption issues (i.e., the effect of §§ 7901, 7901.1 on the local ordinances) in the State Court Action because the premise of such a trial (that NextG was a telephone corporation entitled to utilize the public right-of-way) was incorrect. Upon notice from NextG that it did not oppose a stay of the State Court Action, this court ordered the trial stayed until further order of this court.

## DISCUSSION

Any party aggrieved by a PUC decision "may petition for a writ of review in the court of appeal . . . for the purpose of having the lawfulness of the original order or decision or of the order or decision on rehearing inquired into and determined." (§ 1756, subd. (a).) "Because review by extraordinary writ is the only means of judicial review, a court ordinarily has no discretion to deny a timely-filed petition for writ of review if it appears that the petition may be meritorious." (*Southern California Edison Co. v. Public Utilities Com.* (2006) 140 Cal.App.4th 1085, 1096 [45 Cal.Rptr.3d 485].) In accordance with the applicable standard, this court issued a writ of review to assess the merits of the City's contentions. (See *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1193 [13 Cal.Rptr.3d 630]; *Pacific Bell v. Public Utilities Com.* (2000) 79 Cal.App.4th 269, 276–280 [93 Cal.Rptr.2d 910].)

Our role in reviewing commission decisions is circumscribed. (*City and County of San Francisco v. Public Utilities Com.* (1985) 39 Cal.3d 523, 530 [217 Cal.Rptr. 43, 703 P.2d 381].) "No new or additional evidence shall be introduced upon review by the court. In a complaint or enforcement proceeding, or in a ratemaking or licensing decision of specific application

that is addressed to particular parties, the review by the court shall not extend further than to determine, on the basis of the entire record which shall be certified by the commission, whether any of the following occurred: [¶] (1) The commission acted without, or in excess of, its powers or jurisdiction. [¶] (2) The commission has not proceeded in the manner required by law. [¶] (3) The decision of the commission is not supported by the findings. [¶] (4) The findings in the decision of the commission are not supported by substantial evidence in light of the whole record. [¶] (5) The order or decision of the commission was procured by fraud or was an abuse of discretion. [¶] (6) The order or decision of the commission violates any right of the petitioner under the Constitution of the United States or the California Constitution." (§ 1757, subd. (a).)

■ Moreover, only issues raised in a petition for rehearing filed with the PUC (§ 1731, subd. (b)(1)) may be pursued in a petition to this court. (§ 1732 ["The application for a rehearing shall set forth specifically the ground or grounds on which the applicant considers the decision or order to be unlawful. No corporation or person shall in any court urge or rely on any ground not so set forth in the application."]; *Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 903 [160 Cal.Rptr. 124, 603 P.2d 41], disapproved on a different ground in *Kowis v. Howard* (1992) 3 Cal.4th 888, 896–899 [12 Cal.Rptr.2d 728, 838 P.2d 250].)

■ "There is a strong presumption of validity of the commission's decisions [citations], and the commission's interpretation of the Public Utilities Code should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language [citations]." (*Greyhound Lines, Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406, 410–411 [67 Cal.Rptr. 97, 438 P.2d 801]; see *Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 796 [3 Cal.Rptr.3d 703, 74 P.3d 795] (*Peevey*) [reaffirming principle that deference owed to PUC's interpretation of Pub. Util. Code].) "Statutorily, PUC is authorized to supervise and regulate public utilities and to 'do all things . . . which are necessary and convenient in the exercise of such power and jurisdiction' [citation] . . . . Adverting to these provisions, we have described PUC as ' "a state agency of constitutional origin with far-reaching duties, functions and powers" ' whose ' "power to fix rates [and] establish rules" ' has been ' "liberally construed." ' " (*Peevey, supra,* 31 Cal.4th at p. 792.)

*NextG Is a Telephone Corporation*

■ A "telephone corporation" is a " '[p]ublic utility' " subject to regulation by the PUC. (§ 216, subds. (b), (a); see Cal. Const., art. XII, §§ 3, 6.) The PUC has concluded that NextG is a telephone corporation pursuant to

various sections of the Public Utilities Code. (See §§ 233, 234, 1001, 7901.) In two earlier proceedings, the commission issued certificates of public necessity to NextG, impliedly ruling that NextG was a telephone corporation. (§ 1001 ["No . . . telephone corporation . . . shall begin the construction of . . . a line . . . or of any extension thereof, without having first obtained from the commission a certificate that the present or future public convenience and necessity require or will require such construction."]; see *GTE Mobilnet of California Limited Partnership v. City and County of San Francisco* (N.D.Cal. 2006) 40 F.Supp.2d 1097, 1099 (*GTE Mobilnet*) [proof of authorization to use public rights-of-way typically "takes the form of a certificate of public convenience and necessity" issued by the PUC].) In the proceeding now before this court, the commission directly revisited its implied determinations and found they were correct under the plain language of the Public Utilities Code.

The City takes issue with the PUC's determination that NextG is a "telephone corporation," entitled to construct its "telephone lines" on public rights-of-way. (§ 7901.) In this petition, the City attacks the PUC's conclusion from four different angles: (1) the correctness of the commission's statutory interpretation of the phrase "telephone corporation," particularly as such term is used in section 7901; (2) the commission's jurisdiction to classify a purported "wireless carrier" as a telephone corporation, in light of federal law pertaining to wireless telecommunications providers; (3) the sufficiency of the findings and the evidence to support classifying NextG as a telephone corporation; and (4) the lack of an evidentiary hearing to decide the question of whether NextG was a telephone corporation.

█ We begin with an examination of the relevant statutory provisions. " 'Telephone corporation' includes every corporation or person owning, controlling, operating, or managing any telephone line for compensation within this state." (§ 234, subd. (a).) " 'Telephone line' includes all conduits, ducts, poles, wires, cables, instruments, and appliances, and all other real estate, fixtures, and personal property owned, controlled, operated, or managed *in connection with or to facilitate communication by telephone, whether such communication is had with or without the use of transmission wires.*" (§ 233, italics added.) "The word 'telephone' is not defined in the" Public Utilities Code, but "telephony" is generally understood as a " 'two-way communication by speaking as well as by listening' " at a distance. (*Coml. Communications v. Public Util. Com.* (1958) 50 Cal.2d 512, 522 [327 P.2d 513].) The plain language of sections 233 and 234, subdivision (a), suggests that the Legislature intended to define the term "telephone corporation" broadly, without regard to the particular manner by which users of telephones are put into communication. (See *Coml. Communications v. Public Util. Com., supra,* 50 Cal.2d at pp. 520–523 [in holding that "mobile communication systems" using radio technology to communicate with individuals in vehicles

were § 233 telephone lines, observed that "[t]he exact form or shape of the transmitter and the receiver or the medium over which the communication can be effected is not prescribed by law"].)

" 'Telephone corporation' does not include any of the following: [¶] (1) Any hospital, hotel, motel, or similar place of temporary accommodation owning or operating message switching or billing equipment solely for the purpose of reselling services provided by a telephone corporation to its patients or guests. [¶] (2) *Any one-way paging service utilizing facilities that are licensed by the Federal Communications Commission, including, but not limited to, narrowband personal communications services described in . . . the Code of Federal Regulations . . . .*" (§ 234, subd. (b); see Stats. 1995, ch. 357, § 2, p. 1887 [adding italicized portion to § 234, subd. (b)].) These textual exclusions within section 234 illustrate that the Legislature (despite its demonstrated capability) has not seen fit to explicitly exclude companies providing "mobile" or "wireless" telephone service from the definition of "telephone corporation."

■ According to the City, the Legislature did just that in 2006, by adding section 224.4, subdivision (d), to the Public Utilities Code. (Stats. 2006, ch. 198, § 11, p. 1957.) But all this statute does is define a type of service: " 'Mobile telephony service' means commercially available interconnected mobile phone services that provide access to the public switched telephone network (PSTN) via mobile communication devices employing radiowave technology to transmit calls, including cellular radiotelephone, broadband Personal Communications Services (PCS), and digital Specialized Mobile Radio (SMR)." (§ 224.4, subd. (d).) Section 224.4, subdivision (d), does not establish or define any new type of entity. The Public Utilities Code contemplates that telephone corporations may provide mobile telephony services. (See, e.g., §§ 2886, subd. (a) ["The commission shall require every telephone corporation furnishing mobile telephony service, as defined in Section 224.4, to establish a pricing system made available to subscribers . . . ."], 7943, subd. (b) ["The commission shall request that the Federal Communications Commission grant authority for the commission to order telephone corporations to assign telephone numbers dedicated to mobile telephony service and mobile data service, as defined in Section 224.4, to a separate area code . . . ."].)

■ The importance in this case of designating NextG as a "telephone corporation" is that "telephone corporations" are entitled under state law to utilize public rights-of-way for the deployment of their "telephone lines"

under section 7901.[7] "Telegraph or *telephone corporations may construct* lines of telegraph or *telephone lines* along and *upon any public road or highway*, along or across any of the waters or lands within this State, and may erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters." (§ 7901, italics added.) "It has been uniformly held that [section 7901] is a continuing offer extended to telegraph and telephone companies to use the highways so long as telegraph or telephone service is continued. [Citation.] The company accepts this franchise by the construction and maintenance of lines and thereby assumes the duty to furnish proper and adequate communication service to the public. [Citation.] Thus, in return for the privileges granted under this section, the state is assured of a continuing benefit. The state and the company enter into a binding agreement supported by valid consideration. If the company fails to render the service, the franchise terminates. [Citation.] Moreover, the statute has consistently withstood various constitutional attacks." (*Anderson v. Time Warner Telecom of California* (2005) 129 Cal.App.4th 411, 415–416 [28 Cal.Rptr.3d 289], citing *County of L. A. v. Southern Cal. Tel. Co.* (1948) 32 Cal.2d 378, 384 [196 P.2d 773].) Cities may not charge telephone corporations with franchise fees for the privilege of installing telephone lines in public rights-of-way. (*Williams Communications v. City of Riverside* (2003) 114 Cal.App.4th 642, 651–654 [8 Cal.Rptr.3d 96].)

■ The preceding analysis indicates that the PUC's interpretation of sections 233, 234, and 7901 was correct, even disregarding any deference owed to the commission.[8] The plain language of the pertinent statutory provisions leads to only one reasonable conclusion: The definition of "telephone corporations" for purposes of section 7901 is not limited to those entities utilizing technology invented at the time section 7901 or its prior iterations in the Civil Code were enacted. If an entity owns, controls, operates, or manages telephone lines in connection with telephone communication, the entity is a "telephone corporation" under section 7901. (See *GTE Mobilnet, supra,* 440 F.Supp.2d at pp. 1102–1103 ["wireless carriers are included in the definition of 'telephone corporation' in § 7901 . . ."]; *Cox*

---

[7] The definitions of "telephone line" and "telephone corporation" provided in sections 233 and 234 should be used to interpret and apply section 7901. (See § 5 ["Unless the provision or the context otherwise requires, the definitions, rules of construction, and other general provisions contained in Sections 1 to 22, inclusive, and the definitions in the Public Utilities Act (Chapter 1 (commencing with Section 201) of Part 1 of Division 1), shall govern the construction of this code."].)

[8] Compare *Peevey, supra,* 31 Cal.4th at page 796 (deference owed to PUC's interpretation of Pub. Util. Code) with *Hillsboro Properties v. Public Utilities Com.* (2003) 108 Cal.App.4th 246, 254 [133 Cal.Rptr.2d 343] (stating, in a PUC writ of review case, that "[t]he interpretation of a statute is a question of law, subject to independent review").

*Communications PCS, L.P. v. City of San Marcos* (S.D.Cal. 2002) 204 F.Supp.2d 1272, 1281, fn. 2 [§ 7901 "applies to any telephone corporation that provides wireless or landline services"].)

In light of the plain language of the Public Utilities Code, the City's construction of the relevant statutes, though couched in terms of arcane legislative history, really amounts to a policy argument—i.e., modern mobile phone companies (and companies like NextG that partner with mobile phone companies) do not need the public right-of-way to facilitate their infrastructure as landline telephone providers did in their heyday. This argument, however, is better addressed to the Legislature.

The commission also made sufficient findings and had sufficient evidence before it to conclude that NextG was a telephone corporation. The commission found, and the City does not dispute, that NextG "builds and owns fiber optic networks, on which NextG sells capacity for telecommunications services provided by other carriers that serve end-use customers." This finding supports the commission's conclusion that NextG is a " '[t]elephone corporation' " in the business of "owning, controlling, operating, or managing . . . telephone line[s] for compensation within this state." (§ 234, subd. (a).) NextG's telephone lines are used "in connection with or to facilitate communication by telephone, *whether such communication is had with or without the use of transmission wires*." (§ 233, italics added.) It simply does not matter that NextG's telephone lines will be used to provide wireless services to MetroPCS's individual customers. Nor does it matter that NextG does not directly service individual telephone customers but instead provides services to wireless companies. (See *Williams Communications v. City of Riverside, supra,* 114 Cal.App.4th at pp. 650–654 [interexchange carrier entitled to benefits of § 7901.) No evidentiary hearing beyond the process provided by the commission was necessary for the commission to make its findings because the City was not contesting any facts relevant to the classification of NextG as a telephone corporation.

Finally, the City contends that federal law preempts the commission from regulating NextG. Federal law prohibits state and local governments from regulating "the entry of or the rates charged by any commercial mobile service or any private mobile service, [but does not] prohibit a State from regulating the other terms and conditions of commercial mobile services." (47 U.S.C. § 332(c)(3)(A).) In deference to federal law, the PUC does not issue certificates of public necessity and convenience to wireless carriers "because federal law preempt[s] its authority to regulate the entry of wireless carriers." (*GTE Mobilnet, supra,* 440 F.Supp.2d at p. 1100.)

The commission specifically found in the October 2010 initial decision that NextG was not a wireless carrier because "NextG builds and owns fiber optic

networks, on which NextG sells capacity for telecommunications services provided by other carriers that service end-use customers." The commission also cited its prior issuance of certificates of public convenience and necessity to NextG as proof that NextG was not a wireless carrier. The PUC therefore distinguishes between wireless carriers (i.e., "commercial mobile services" or "private mobile services" under federal law) and a "carrier's carrier" like NextG.

██ The City condemns this distinction, but offers no legal authority or reasoned analysis for the proposition that NextG is a "commercial mobile service" or "private mobile service," defined terms under the relevant federal statute.[9] The City does not refer to these definitions in its briefs, does not cite to cases or regulatory decisions applying these definitions, and does not make a reasoned argument for why NextG falls within these definitions. The City therefore waives this argument. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [124 Cal.Rptr.3d 78] [appellate briefs must be supported by reasoned argument and citations to authority or else issue is waived].) Absent clear authority for doing so, we are not inclined to upend the commission's long-standing practice of distinguishing between firms like NextG and wireless providers.

Because we agree with the commission's interpretation and application of the relevant statutes on the merits, we need not address the various alleged procedural bars to our review that are asserted by the commission and NextG, i.e., that prior final commission decisions preclude the City's petition (§ 1709) or that some of the specific arguments raised in the petition were not properly raised at the PUC in the petition for rehearing (§ 1732).

---

[9] "[T]he term 'commercial mobile service' means any mobile service (as defined in section 3 [47 USCS § 153]) that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation . . . ." (47 U.S.C. § 332(d)(1).) "[T]he term 'private mobile service' means any mobile service (as defined in section 3 [47 USCS § 153]) that is not a commercial mobile service or the functional equivalent of a commercial mobile service, as specified by regulation by the Commission." (47 U.S.C. § 332(d)(3).) "The term 'mobile service' means a radio communication service carried on between mobile stations or receivers and land stations, and by mobile stations communicating among themselves, and includes (A) both one-way and two-way radio communication services, (B) a mobile service which provides a regularly interacting group of base, mobile, portable, and associated control and relay stations (whether licensed on an individual, cooperative, or multiple basis) for private one-way or two-way land mobile radio communications by eligible users over designated areas of operation, and (C) any service for which a license is required in a personal communications service established pursuant to the proceeding entitled 'Amendment to the Commission's Rules to Establish New Personal Communications Services' (GEN Docket No. 90-314; ET Docket No. 92-100), or any successor proceeding." (47 U.S.C. § 153(33).)

*Approval of the Application and Preemption*

The City's other major contention pertains to whether the commission properly preempted the City's Undergrounding Ordinance to the extent it conflicts with the commission's approval of the project.[10] The City argues this point by asking this court to address five distinct questions: (1) whether the commission illegally usurped the City's authority under section 2902 to regulate the public right-of-way; (2) whether the commission violated the City's rights "under the California Constitution to regulate the use of the right-of-way"; (3) whether the commission abused its discretion by purporting to "preempt" the Undergrounding Ordinance; (4) "[w]hether the [c]ommission abused its discretion by not conducting an evidentiary hearing" on the question of preemption; and (5) "whether the [c]ommission's finding that the Undergrounding Ordinance was contrary to statewide interests in utility regulation was supported by substantial evidence."

"A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) "A city, county, or other public body may not regulate matters over which the Legislature grants regulatory power to the Commission. . . ." (Cal. Const., art. XII, § 8.)

The right of telephone corporations to construct telephone lines in public rights-of-way is not absolute. It has been observed by our Supreme Court that section 7901 grants "a limited right to use the highways and [does so] only to the extent necessary for the furnishing of services to the public." (*County of L. A. v. Southern Cal. Tel. Co., supra,* 32 Cal.2d at p. 387.) The text of section 7901 provides that telephone lines may not "incommode the public use of the road or highway . . . ." (*Ibid.*) Section 7901.1 states that "[i]t is the intent of the Legislature, consistent with Section 7901, that municipalities shall have the right to exercise reasonable control as to the time, place, and manner in which roads, highways, and waterways are accessed." (§ 7901.1, subd. (a).) "The control, to be reasonable, shall, at a minimum, be applied to all entities in an equivalent manner." (§ 7901.1, subd. (b).)

In addition, section 2902 states that municipal corporations may not "surrender to the commission its powers of control to supervise and regulate the relationship between a public utility and the general public in matters affecting the health, convenience, and safety of the general public, including matters such as the use and repair of public streets by any public utility, the location of the poles, wires, mains, or conduits of any public utility, on,

---

[10] The commission's decision and the City's argument do not address the Wireless Ordinance specifically, but the same considerations would seem to apply.

under, or above any public streets, and the speed of common carriers operating within the limits of the municipal corporation."

In sum, the Public Utilities Code specifically contemplates potential conflicts between the rights of telephone corporations to install telephone lines in the public right-of-way and the rights of cities to regulate local matters such as the location of poles and wires. Some arbiter must resolve these conflicts (when they arise) between telephone corporations and local governments. For instance, a court might adjudicate the dispute. (See, e.g., *Sprint PCS Assets, LLC v. City of Palos Verdes Estates* (9th Cir. 2009) 583 F.3d 716, 725 ["California law does not prohibit local governments from taking into account aesthetic considerations in deciding whether to permit the development of" wireless telecommunications facilities pursuant to §§ 7901, 7901.1]; *GTE Mobilnet, supra,* 440 F.Supp.2d at pp. 1102–1106 [rejecting claim that § 7901 preempts local regulations as a matter of law].)

Throughout the PUC proceeding, the participants agreed that the validity of the City's ordinances was not at issue. A stipulation and a scoping order were in agreement that the PUC would not address the "validity" of the City's ordinances. Instead, the parties agreed that a court (at this point, the State Court Action) would be the proper venue for weighing the validity of the ordinances. The PUC explicitly noted in its initial decision that it was not preempting the City's ordinances. Indeed, the City and NextG *still* agree (as evidenced by their briefs in this proceeding) that the State Court Action will adjudicate whether the City's ordinances violate sections 7901 and 7901.1.

Despite this procedural history, the PUC nonetheless concluded—in denying the City's application for rehearing—that the PUC's decisions and orders "preempted" the City's ordinances in some fashion. The PUC apparently takes the position that validity and preemption are distinct issues. In its response to the City's amended petition, the commission observes: "The issue of whether the City's undergrounding ordinance is otherwise valid is the more difficult question, but that issue was not before the Commission and it is not now before this Court. The only issue here is whether the Commission decisions lawfully preempt any inconsistent provisions of that ordinance." The commission points to its power as a statewide agency to override the preferences of local governments. "[L]ocal ordinances are controlled by and subject to general state laws and the regulations of statewide agencies regarding matters of statewide concern. Accordingly, the commission has been held to have paramount jurisdiction in cases where it has exercised its authority, and its authority is pitted against that of a local government involving a matter of statewide concern." (*Orange County Air Pollution Control Dist. v. Public Util. Com.* (1971) 4 Cal.3d 945, 950–951 [95 Cal.Rptr. 17, 484 P.2d 1361], fn. omitted.)

We do not doubt the commission's authority to approve public utilities' proposed projects or order public utilities to make improvements. (See, e.g., §§ 701 [general power of commission to "do all things . . . which are necessary and convenient in the exercise of [its] power and jurisdiction"], 762 [authorizing commission to order the construction and "fix the site" of facilities], 1001 [power to issue certificates of public convenience and necessity for public utility construction].) Nor do we gainsay the statewide interest in the development of telecommunications services. (§ 767.7, subd. (a).) Had NextG specifically applied for an order of the PUC preempting all local ordinances because of a statewide interest in placing NextG's telephone lines in the precise manner specified in the Project, the PUC may well have had the power to reach such a result. (See *Newpath Networks LLC v. City of Irvine* (C.D.Cal., Dec. 23, 2009, No. SACV 06-550-JVS (ANx)) 2009 U.S.Dist. Lexis 126178 [finding no preemption by PUC under circumstances of the case, but stating that PUC can specifically preempt local regulations through §§ 762 & 1001 powers].)

But NextG did not initiate and the commission did not hold proceedings designed to entertain the question of whether the City's ordinances should be deemed invalid or preempted.[11] Under the commission's own procedural rules, "[t]he purpose of an application for rehearing is to alert the Commission to a legal error, so that the Commission may correct it expeditiously." (Cal. Code Regs., tit. 20, § 16.1, subd. (c).) We see no authority in the commission's rules or elsewhere for the notion that the scope of the underlying proceeding can be expanded during the reconsideration process to

---

[11] The PUC indicates that its general order No. 159-A does not apply to this case "because the subject of that [general order] is cellular siting, which is not at issue in this petition." But the process set forth in general order No. 159-A seems to provide a reasonable framework had the commission actually sought from the beginning of this proceeding to consider the question of "preemption." "The Commission acknowledges that local citizens and local government are often in a better position than the Commission to measure local impact and to identify alternative sites. Accordingly, the Commission will generally defer to local governments to regulate the location and design of cell sites and [mobile telephone switching offices] including a) the issuance of land use approvals; b) acting as Lead Agency for purposes of satisfying the CEQA and c) the satisfaction of noticing procedures for both land use approvals and CEQA procedures. [¶] However, in so doing, *the Commission shall retain its right to preempt a local government determination on siting when there is a clear conflict with the Commission's goals and/or statewide interests.* In those instances, the cellular service provider shall have the burden of demonstrating that accommodating local government's requirements for any specific site would unduly frustrate the Commission's goals or statewide interests. Further, local government and citizens shall have an opportunity to protest a request for preemption and to present their positions. *If a cellular service provider establishes that an action by local government unduly frustrates the Commission's objectives, then the Commission may preempt a local government* pursuant to the Commission's authority under the California Constitution, Article XII, section 8." (PUC general order No. 159-A, pp. 3–4, italics added.) The proceedings under review in this case never focused on whether accommodating the City's ordinances would unduly frustrate the commission's goals or statewide interests.

the detriment of a party. The PUC should have summarily rejected the City's argument as beyond the scope of the proceeding to the extent it suggested the PUC should consider the validity of the ordinances or the question of preemption. All NextG sought in its application was conditional approval of its Project and that is all the commission should have provided.

■ The commission cannot bootstrap a limited, conditional approval of NextG's public right-of-way Project (arising out of a process expressly designed to avoid consideration or analysis of the validity of the City's ordinances) into an order that preempts the local ordinances. The Legislature clarified in section 7901.1 that local governments retain their constitutional authority to impose regulations with regard to the time, place, and manner of construction of telephone lines in public rights-of-way, so long as such regulations are "reasonable." The commission decisions never engage in any analysis that would support a finding that the City's ordinances are unreasonable and therefore inconsistent with state law. Nor do the commission decisions point to authority for preempting all local section 7901.1 regulations without any consideration of the effect or reasonableness of the regulations at issue. The stipulation and the PUC's scoping memorandum demonstrate it was agreed that a court (and not the PUC) would decide how to balance NextG's right as a telephone corporation to use the public right-of-way and the City's right to regulate the time, place, and manner of infrastructure installation in the public right-of-way.

■ To reiterate, we are not faced with a scenario in which the PUC explicitly took on the task of evaluating whether the City's ordinances were reasonable (and therefore valid) or unreasonable (perhaps because they conflicted with statewide policy and were therefore "preempted"). Under the circumstances presented, we need only observe that the commission violated the procedural rights of the City and thereby abused its discretion by purporting to "preempt" City ordinances through its "approval" of the Project. We offer no opinion with regard to the effect of the City's ordinances on NextG's Project or the validity of the City's ordinances under state law, matters which will apparently be addressed at trial in the State Court Action.[12]

---

[12] NextG argues in its answer to the petition that the commission was actually considering CEQA issues when it preempted the City's ordinances. There is some overlap in the decisions between CEQA issues and more general approval of the Project issues. But the PUC did not make this argument in its answer and our reading of the commission decisions does not support NextG's argument. It is clear that the PUC's approval of the Project extended beyond merely approving the negative declaration as an accurate disclosure of the environmental impact (or lack thereof) of the Project.

## DISPOSITION

The October 2010 initial decision (D.10-10-007) and the January 2011 rehearing decision (D.11-01-027) are affirmed in part and reversed in part. The PUC's conclusion of law that the City's ordinances are preempted by reason of the commission's approval of the Project is reversed and set aside. The commission decisions are otherwise affirmed. In the interests of justice, the parties shall bear their own costs incurred in this review proceeding.

Bedsworth, Acting P. J., and Thompson, J., concurred.

A petition for a rehearing was denied April 11, 2013, and respondent's petition for review by the Supreme Court was denied June 26, 2013, S210116.