Filed 3/13/25

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

----

| | |
|---|---|
| VOLCANO TELEPHONE COMPANY et al., | C099562 |
| Petitioners, | (Cal. P.U.C. Dec. Nos. 23-02-008, 23-08-051) |
| v. | |
| PUBLIC UTILITIES COMMISSION, | |
| Respondent; | |
| PUBLIC ADVOCATES OFFICE OF THE CALIFORNIA PUBLIC UTILITES COMMISSION, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; Petition for writ of review.

BRB Law, Sarah J. Banola, Patrick M. Rosvall, and Chan Q. Vu for Petitioners.

Christine Hammond, Edward Moldavsky, Tovah Trimming, Sophia J. Park, and Carrie Pratt for Respondent.

No appearance for Real Party in Interest.

1

This original proceeding arises out of Petitioner Volcano Telephone Company's most recent general rate case before the Public Utilities Commission (PUC). Volcano Telephone receives rate subsidies from the California High-Cost Fund-A (A-Fund) administered by the PUC for providing telephone service in rural areas. Petitioner Volcano Vision, Inc. uses Volcano Telephone's broadband-capable facilities that are subsidized by the A-Fund to deliver broadband services without contributing toward the underlying cost of these facilities. As a result of the relationship between the two affiliates and a prior PUC decision ordering so-called "broadband imputation" in the calculation of A-Fund support in rate cases, the PUC considered Volcano Vision's net revenues from the use of Volcano Telephone's facilities in setting the amount of Volcano Telephone's A-Fund subsidy and approving future rates. The PUC's decisions setting the subsidy and rates also ordered Volcano Telephone to submit broadband service quality metrics related to Volcano Vision's services that rely on Volcano Telephone's facilities.

Petitioners raise various challenges to Cal.P.U.C., Decision No. 23-02-008 (Feb. 2, 2023) (hereafter Decision No. 23-02-008), as modified by Cal.P.U.C., Decision No. 23-08-051 (Aug. 31, 2023) (hereafter Decision or Decision No. 23-08-051). Petitioners argue the PUC's implementation of broadband imputation constitutes an unconstitutional taking and conflicts with federal law. Petitioners raise multiple arguments related to their assertion that the Decision unlawfully imposes broadband service quality regulations on Volcano Vision: They challenge the order to submit Volcano Vision's service quality information as outside the scope of these proceedings and the PUC's jurisdiction, preempted by federal law, an abuse of discretion, and unsupported by necessary findings of fact. Petitioners further argue the PUC erroneously failed to adjust expense caps and Volcano Telephone's operating expenses for the test year. In supplemental briefing, the parties address the impact of the Federal Communications Commission's (FCC) subsequent decision to reclassify broadband Internet access service as a

telecommunications service under title II of the Telecommunications Act[1] on Petitioners' federal preemption arguments.

We reject Petitioners' claims and affirm Decision Nos. 23-02-008 and 23-08-051.

## I. BACKGROUND

Volcano Communications Company is the holding company for six subsidiaries including Petitioners Volcano Telephone and Volcano Vision. Volcano Telephone is a local exchange carrier furnishing local, toll, and access telephone service over broadband-capable facilities to residential and business customers in Alpine, Amador, Calaveras, and El Dorado counties. Volcano Vision provides broadband service to customers inside and outside of Volcano Telephone's service territory. In Volcano Telephone's territory, service is enabled through Volcano Vision's purchase of wholesale Digital Subscriber Line (DSL) service from Volcano Telephone through the National Exchange Carrier Association (NECA) FCC Tariff No. 5.

The A-Fund program provides rate subsidies to small telephone companies like Volcano Telephone that service rural areas to offset the high cost of serving these areas.

---

[1] "In 1934, Congress adopted the Communications Act of 1934 (47 U.S.C. § 151 et seq.) and created the Federal Communications Commission (FCC). The FCC's purpose was to regulate interstate and foreign commerce in communication by wire and radio and make available, insofar as possible, communication services with adequate facilities at reasonable charges. (47 U.S.C. § 151.) [¶] In 1996, Congress updated that legislation by passing the Telecommunications Act of 1996 (Pub.L. No. 104-104 (Feb. 8, 1996) 110 Stat. 56)." (*Calaveras Telephone Co. v. Public Utilities Com*. (2022) 87 Cal.App.5th 793, 797-798 (*Calaveras I*).) As relevant to this proceeding, the 1996 Telecommunications Act distinguishes "between telecommunication services, which are subject to title II of the act, and information services, which are addressed in title I of the act. [Citation.] Telecommunication services are given common carriage status, which subjects them to an array of statutory restrictions and requirements. [Citation.] In contrast, information services are exempted from common carriage status and regulation." (*Calaveras I,* supra, at p. 798, italics omitted.)

(Pub. Util. Code, § 275.6.)[2]  The subsidies are funded by surcharges authorized by the PUC.  (§ 275, subd. (b).)  In administering the program, the PUC sets the rates to be charged by the telephone company receiving the subsidy and determines its "revenue requirement."  (§ 275.6, subd. (c).)  "Revenue requirement" is defined by statute to "mean[] the amount that is necessary for a telephone corporation to recover its reasonable expenses and tax liabilities and earn a reasonable rate of return on its rate base."  (*Id*., subd. (b)(5).)  The PUC is tasked with providing "universal service rate support from the [A-Fund] program to small independent telephone corporations in an amount sufficient to supply the portion of the revenue requirement that cannot reasonably be provided by the customers of each small independent telephone corporation after receipt of federal universal service rate support."  (*Id*., subd. (c)(4).)  The PUC is also charged with ensuring "that support is not excessive so that the burden on all contributors to the [A-Fund] program is limited."  (*Id*., subd. (c)(7).)  The PUC fashions a rate design, which is "the mix of end user rates, high-cost support, and *other revenue sources* that are targeted to provide a fair opportunity to meet the revenue requirement of the telephone corporation."  (*Id*., subd. (b)(3), italics added; see *id.*, subd. (b)(4).)  The "other revenue sources" language and the directive that the PUC ensure that support is not excessive gave rise to the concept of broadband imputation.[3]

In 2021, the PUC issued *Decision Adopting Broadband Imputation in the General Rate Cases of the Small Independent Local Exchange Carriers* (2021) Cal. P.U.C. Decision No. 21-04-005 (Imputation Decision) based in part on the conclusion that, with

---

[2]  Undesignated statutory references are to the Public Utilities Code.

[3]  Section 275.6 also provides that, "[u]pon request from the commission, a small independent telephone corporation that receives support from the [A-fund] program shall provide information regarding revenues derived from the provision of unregulated internet access service by that corporation or its affiliate within that corporation's telephone service territory."  (§ 275.6, subd. (e).)

4

respect to 10 small independent local exchange carriers including Volcano Telephone, retail broadband revenues net of related expenses of these companies and their Internet service provider (ISP) affiliates are properly categorized as an "other revenue source" and should be considered to ensure that A-Fund support is not excessive. (*Id*., pp. 2, 8, 19.) The PUC found that these telephone companies share common ownership, inventory, personnel, loop facilities, equipment, offices, customer billing, and operations with their ISP affiliates. (*Id*., p. 23.) This Imputation Decision ordered that, in the general rate cases of these 10 telephone companies, "[a]ll reasonable positive retail broadband-related revenues of the [telephone company] and its [ISP] affiliate . . . (but excluding revenues derived from areas outside of the [telephone company's] telephone service territory and revenues resulting from alternative service platforms that are not based upon the [telephone company's] local exchange facilities) net of all reasonable broadband-related expenses of the [telephone company] and its ISP affiliate . . . for the calendar year immediately preceding the filing of the [general rate case] application shall be imputed in the determination of rate design and [A-Fund] support." (*Id*., pp. 23-24.) The Imputation Decision also ordered these telephone companies to submit a financial statement detailing these revenues and expenses with their general rate case applications. (*Id*., p. 24.) The statement is subject to a "reasonableness review and/or audit" by the PUC. (*Id*., p. 25.)

The 10 small independent telephone companies unsuccessfully challenged the Imputation Decision in *Calaveras I*. The Fifth District Court of Appeal concluded "the authority granted by section 275.6 is broad enough to allow the [PUC] to adopt broadband imputation." (*Calaveras I, supra*, 87 Cal.App.5th at p. 796.) In an unpublished portion of the opinion, the court rejected a federal preemption argument in part by explaining "broadband imputation is appropriately characterized as a public utility type of regulation of the telephone companies"; the court reasoned that "to the extent that the ISP affiliates experience the indirect effects from broadband imputation, those effects are not properly described as economic or public utility type regulations *of*

*the ISP affiliates*." The court concluded the plaintiffs' assertion that broadband imputation is an unconstitutional taking of private property was unripe.

" 'The basic approach of the [C]ommission in rate making . . . is to take a test year and determine the revenues, expenses, and investment for the test year. . . . A general rate case application is filed two years before the test year." (*Calaveras Telephone Co. v. Public Utilities Com*. (2019) 39 Cal.App.5th 972, 977.) Rate cases are submitted every five years.

Volcano Telephone filed a general rate case application in 2021 with a 2023 test year. The application noted Volcano Telephone was prepared to make more than $22 million in investments to network upgrades through the end of 2023 and asserted that its investments in broadband-capable facilities were appropriate for inclusion in its rate base even though Volcano Telephone does not provide Internet access service itself.

The PUC issued Cal.P.U.C., Decision No. 23-02-008 (Feb. 2, 2023) calculating Volcano Telephone's A-Fund subsidy at almost $3 million and approving the revenue requirement, rate design, and selected rates for test year 2023. The PUC also directed Volcano Telephone to submit "its" broadband service quality metrics annually.

Volcano Telephone and Volcano Vision filed an application for rehearing.

The PUC denied rehearing and modified Decision No. 23-02-008 to clarify that Volcano Telephone was required to submit annual reports regarding *Volcano Vision's* broadband service quality metrics related to broadband services within Volcano's service territory that rely on Volcano Telephone's broadband-capable facilities. (Decision No. 23-08-051.)

Petitioners filed a timely petition for writ of review of the Decision in this court. (§ 1756.) The PUC filed an answer, and Petitioners filed a reply. At Petitioners' request, we ordered supplemental briefing regarding *In the Matter of Safeguarding and Securing The Open Internet Restoring Internet Freedom* (FCC, May 7, 2024) WC Docket Nos. 23-

6

320, 17-1082024, FCC 24-52 [2024 WL 2109860] (2024 FCC Order). After the parties filed their supplemental briefs, we issued a writ of review.

## II. DISCUSSION

*A.    Standard of Review*

"A writ of review or mandamus in the Court of Appeal or Supreme Court is the exclusive means of judicial review of an order or decision by the PUC. ([]§ 1759.) Because review by extraordinary writ is the only means of judicial review, a court ordinarily has no discretion to deny a timely-filed petition for writ of review if it appears that the petition may be meritorious." (*Southern California Edison Co. v. Public Utilities Com*. (2006) 140 Cal.App.4th 1085, 1095-1096.) "In accordance with the applicable standard, this court issued a writ of review to assess the merits of [petitioners'] contentions." (*City of Huntington Beach v. Public Utilities Com*. (2013) 214 Cal.App.4th 566, 583.)

"Our role in reviewing commission decisions is circumscribed." (*City of Huntington Beach v. Public Utilities Com., supra*, 214 Cal.App.4th at p. 583.) Specifically, our review of the Decision "shall not extend further than to determine, on the basis of the entire record . . . , whether any of the following occurred: [¶] (1) The commission acted without, or in excess of, its powers or jurisdiction. [¶] (2) The commission has not proceeded in the manner required by law. [¶] (3) The decision of the commission is not supported by the findings. [¶] (4) The findings in the decision of the commission are not supported by substantial evidence in light of the whole record. [¶] (5) The order or decision of the commission was . . . an abuse of discretion. [¶] (6) The order or decision of the commission violates any right of the petitioner under the Constitution of the United States or the California Constitution." (§ 1757, subd. (a).)

Section 1760 provides that "in any proceeding wherein the validity of any order or decision is challenged on the ground that it violates any right of petitioner under the United States Constitution or the California Constitution, the . . . [C]ourt of [A]ppeal

7

shall exercise independent judgment on the law and the facts, and the findings or conclusions of the commission material to the determination of the constitutional question shall not be final." Nonetheless, we are not authorized to substitute our "own judgment as to the weight to be accorded evidence before the [PUC] or the purely factual findings made by it." (*Goldin v. Public Utilities Com.* (1979) 23 Cal.3d 638, 653.) "In other words, judicial reweighing of evidence and testimony is ordinarily not permitted. [Citations.] The only exception is those findings or conclusions 'drawn from undisputed evidence . . . from which conflicting inferences may not reasonably be drawn [and therefore] present questions of law.' " (*Pacific Gas & Electric Co. v. Public Utilities Com*. (2015) 237 Cal.App.4th 812, 838-839.)

## B.     Alleged Taking

Petitioners argue the Decision's implementation of broadband imputation constitutes an unconstitutional taking. They assert the Decision "create[s] an irreconcilable gap between utility costs and revenues that violates constitutional ratemaking standards."[4] (Emphasis omitted.) We are unpersuaded.

As set forth above, this is not the first time Petitioners have raised a taking claim related to broadband imputation. In an unpublished portion of *Calaveras I*, the Fifth District Court of Appeal concluded the plaintiffs' claim that broadband imputation constitutes an unconstitutional taking of private property was unripe because the PUC had not yet implemented broadband imputation in setting rates. As such, the total effect of broadband imputation on the telephone companies' rates could not be determined.

---

[4] Potentially lurking under this heading is an argument that the PUC's "removal of broadband imputation amounts from its tax calculation is an independent legal error because it deviates from the plain language of the decision that adopted broadband imputation" and constitutes an abuse of discretion. "Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading." (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179.) This is an ongoing problem in the petition.

8

Now that the PUC has used broadband imputation in setting Volcano Telephone's rates, Petitioners argue it has resulted in an unconstitutional taking.

A federal district court case that was decided after the petition was filed rejected a similar taking argument raised by a different small, rural telephone company and its affiliated ISP on the basis that the A-Fund program is a voluntary subsidy program. (*Sierra Telephone Company, Inc. v. Reynolds* (E.D.Cal. 2023) 703 F.Supp.3d 1163, 1170, 1177-1178 (*Sierra Telephone*).)[5] Petitioners did not address the voluntariness issue in their petition despite it being one of the reasons the PUC used to reject their taking argument in the Decision.

"A property owner must be legally compelled to engage in price-regulated activity for regulations to give rise to a taking." (*Garelick v. Sullivan* (2d Cir. 1993) 987 F.2d 913, 916.) Usually, public utilities have a statutory duty to serve the public and must do so at government-determined rates. (*Ibid*.) "By contrast, where a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service and thus there can be no taking." (*Ibid*.)

The A-Fund subsidy is a voluntary price-regulated program. Volcano Telephone is not required to participate in the A-Fund program that sets the framework for this ratemaking proceeding. As the PUC notes, some eligible carriers do not. (See Cal.P.U.C., Dec. No. 14-12-084 (Dec. 18, 2014) p. 2, fn.1.) On reply, Petitioners argue that, in practice, participation in the A-Fund program is not voluntary. To receive an A-Fund subsidy, Volcano Telephone must be a carrier of last resort in its service territory. (§ 275.6, subd. (d)(3).) A "carrier of last resort" is "a telephone corporation that is required to fulfill all reasonable requests for service within its service territory."

_____

[5] The district court granted the defendants' motion to dismiss with leave to amend (*Sierra Telephone, supra*, 703 F.Supp.3d at p. 1190), but the plaintiffs did not do so and the parties stipulated to the dismissal of the action with prejudice.

9

(§ 275.6, subd. (b)(1).) Petitioners cite statutes explaining that a public utility cannot change a rate except after a showing before the PUC "that the new rate is justified" (§ 454, subd. (a)) and charges generally "shall be just and reasonable" (§ 451), but neither citation addresses whether the PUC would be able to set Volcano Telephone's rates at a level that would prevent it from earning a sufficient rate of return on the basis that it could have or should have participated in the A-Fund program. The decision Petitioners cite that established a "range of reasonableness" for rates was in the context of administering the A-fund program. (Cal.P.U.C., Dec. No. 21-06-004 (June 3, 2021) p. 3.)

In *Sierra Telephone, supra*, 703 F.Supp.3d 1163, the district court concluded that even assuming it could overcome the voluntariness issue, the factual allegations did not support the plaintiffs' takings theory. (*Id.* at p. 1178.) We conclude similar defects exist in this petition.

To establish an unconstitutional taking in the ratemaking context, "[t]he burden is on petitioners to show the rate of return (or cost of capital) established by the PUC was clearly confiscatory. That is, there must be a clear showing the rate of return was '*so "unjust" as to be confiscatory*,' such as by demonstrating the rate is so unreasonably low it will threaten the utility's financial integrity by impeding the utility's ability to raise future capital or adequately compensate current equity holders. [Citations.] A rate of return lower than the utility asserts is necessary may nevertheless be reasonable or within a range of reasonableness, constitutionally speaking, if it is ' "higher than a confiscatory level." ' " (*Ponderosa Telephone Co. v. Public Utilities Com*. (2019) 36 Cal.App.5th 999, 1016.) Additionally, Petitioners' "burden is coupled with a strong presumption of the correctness of the findings and conclusions of the commission, which may choose its own criteria or method of arriving at its decision, even if irregular, provided unreasonableness is not 'clearly established.' " (*Pacific Tel. & Tel. Co. v. Public Utilities Com.* (1965) 62 Cal.2d 634, 647.)

Petitioners contend the Decision adopts a rate structure under which Volcano Telephone's revenues are $1,592,174 lower than its costs of providing utility service. This is untrue. The Decision adopted a "revenue requirement" of $10,798,962. "Revenue requirement" is not a constitutional term, but a statutory one defined as "the amount that is necessary for a telephone corporation to recover its reasonable expenses and tax liabilities and *earn a reasonable rate of return* on its rate base." (§ 275.6, subd. (b)(5), italics added.) This is not, as Petitioners suggest, Volcano Telephone's "costs" because a "revenue requirement" includes a reasonable rate of return. Here, as Petitioners note, the Decision used 9.12 percent as the rate of return. This figure was stipulated to by the parties based on an earlier PUC decision. (Cal.P.U.C., Dec. No. 16-12-035 (Dec. 15, 2016).) In adopting the rates, the Decision used a "[t]otal [r]evenue" of $10,798,962 and a "[t]otal [r]egulated [r]evenue" of $9,206,788—the difference being the broadband imputation amount. Petitioners argue that by imputing revenue in the rate design, the rate design only provides Volcano Telephone with an opportunity to earn a 3.48 percent rate of return. This argument presupposes that the concept of broadband imputation is incorrect in that Volcano Telephone has no opportunity to earn fair compensation from Volcano Vision for the underlying costs of Volcano Telephone's broadband-capable facilities. Moreover, this argument is of a "generalized or theoretical nature" (*Ponderosa Telephone Co. v. Public Utilities Com., supra*, 36 Cal.App.5th at p. 1018) in that it assumes that the rate of return used in this Decision has some relationship to the constitutional minimum and that if PUC relies on any of Volcano Vision's broadband profits to achieve the adopted rate of return, it must be constitutionally infirm. Petitioners do not establish this is so. (See, e.g., *Sierra Telephone, supra*, 703 F.Supp.3d at pp. 1180-1181 [rejecting similar argument based on Cal.P.U.C., Dec. No. 16-12-035 (Dec. 15, 2016) that Sierra Telephone required a 9.22 percent rate of return on regulated investments to cover its costs of capital].) Broadband imputation is based on the idea that

11

these "other revenue sources" give the telephone company a fair opportunity to meet its revenue requirement. (*Calaveras I, supra*, 87 Cal.App.5th at p. 809.)

Petitioners do not successfully attack this idea because their argument relies entirely on the faulty premise that any consideration of an affiliate's revenues was repudiated in *Brooks-Scanlon Co. v. Railroad Commission of Louisiana* (1920) 251 U.S. 396. It was not. There, a corporation operating a sawmill and lumber business sought to set aside an order of the Railroad Commission of Louisiana requiring it to operate a narrow-gauge railroad, which would have involved a loss of more than $1,500 a month. (*Id*. at p. 397.) The United States Supreme Court explained that "[a] carrier cannot be compelled to carry on even a branch of business at a *loss* . . . ." (*Id*. at p. 399, italics added.) *Brooks-Scanlon* is distinguishable because there is no evidence that Volcano Communications or any of its affiliates are being compelled to carry a branch of business at a loss. Additionally, any argument based on the adopted rate of return is circular because subsumed in the concept of broadband imputation is the idea that what we have here are not separate branches but a shared root system that created excessive A-Fund draws for telephone companies like Volcano Telephone. (Cal.P.U.C., Dec. No. 21-08-042 (Aug. 19, 2021) p. 21.) The Imputation Decision was based in part on evidence that the telephone companies and their ISP affiliates operate as one entity. (Imputation Decision, p. 11.) They also share investors. (*Id*., p. 10.) The PUC determined the telephone company's A-fund draw is excessive because it is used to invest in broadband-capable facilities while ISP affiliates like Volcano Vision do not contribute to the underlying costs of the facilities. (Cal.P.U.C., Dec. No. 21-08-042 (Aug. 19, 2021) pp. 7, 9.) Put differently, the rate of return was too high to the extent it did not take the relationship between the two affiliates into consideration. In essence, calculating Volcano Telephone's revenue requirement without consideration of Volcano Vision's profits from Volcano Telephone's broadband-capable facilities results in an inaccurate picture

regarding Volcano Telephone's true needs.  There was no similar suggestion in *Brooks-Scanlon* and Petitioners do not successfully dispel this notion.

"It is not theory but the impact of the rate order which counts.  If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry . . . is at an end."  (*Federal Power Commission v. Hope Natural Gas Co.* (1944) 320 U.S. 591, 602.) "Rates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so-called 'fair value' rate base."  (*Id*. at p. 605.)

We conclude Petitioners have not met their burden of clearly demonstrating a taking in violation of their constitutional rights.

C.     *Ordering Paragraph 3*

Petitioners raise various challenges to the first two provisions of so-called "Ordering Paragraph 3," which provide:  "Volcano Telephone Company is directed to submit its ISP affiliate's (Volcano Vision) broadband service quality (SQ) metrics related to broadband services within Volcano's service territory that rely on Volcano's broadband-capable facilities to the Communication Division on [an] annual basis using a Tier 1 Advice Letter.  The SQ metrics should include: (1) A total number of broadband service orders received and the number of those orders completed per month, during the previous 12 months; [and] (2) Monthly broadband trouble tickets as a result of customer-initiated complaints on its ISP affiliate's (Volcano Vision) broadband service in California."  Underlying Petitioners' arguments with respect to Ordering Paragraph 3 is the inaccurate suggestion that it imposes requirements for broadband service quality on Volcano Vision rather than merely requirements that information about broadband service quality be supplied.  We reject any arguments based on this faulty premise.

1. *Scoping Memo*

Petitioners argue Ordering Paragraph 3 is beyond the scope of Volcano Telephone's rate case because the scoping memo does not include the adoption of any new reporting requirements or service quality metrics concerning Volcano Vision. A commissioner in a rate setting proceeding must issue a scoping memo "that describes the issues to be considered." (§ 1701.1, subd. (b)(1).) "Identifying the issues under consideration facilitates informed participation—including presentation of arguments and evidence—by those who may have a stake in the resolution of those issues. [¶] If the Commission cannot fairly be said to have complied with the statutory scoping memo requirement, it has failed to regularly pursue its authority." (*Golden State Water Co. v. Public Utilities Com*. (2024) 16 Cal.5th 380, 394-395.) To address Petitioners' claim, we must ask whether the scoping memo "fairly include[d] the issue" in that "an informed observer would . . . reasonably have understood from the scoping memos" that the challenged portions of Ordering Paragraph 3 were within its scope. (*Id.* at pp. 394, 398.) We conclude the scoping memo did fairly include this issue.

Real Party in Interest the Public Advocates Office of the PUC filed a protest to Volcano Telephone's application proposing issues to be considered. In particular, the Public Advocates Office argued "[t]he Commission should review Volcano's service quality for both voice and broadband services to ensure they are 'safe, reliable, high-quality communication's services.'" In reply, Volcano Telephone explained that it agreed that "[s]ervice quality for voice service is . . . appropriate for inclusion in the scope, as it informs both revenue requirement and rate design" but argued that " 'service quality for . . . broadband service' " provided by its ISP affiliate should not be addressed in the proceeding. After reviewing these documents, the assigned commissioner identified the issues to be determined or otherwise considered in the proceeding. The issues set forth in the scoping memo included:

14

"a.     What level of revenue requirement (including corporate and operating expenses, depreciation expenses, rate base and new plant additions and tax liabilities) is necessary to provide Volcano with revenues and earnings sufficient to allow it to operate in a manner that allows it to deliver safe, reliable, high-quality voice communication services, which comply with Section 451 and General Order 133-D?

"[¶] . . . [¶]

"e.     Is Volcano [Telephone]'s proposed [A-fund] draw/subsidy for test year 2023 appropriate?

"[¶] . . . [¶]

"g.     Are the proposed plant improvements necessary for providing safe, reliable, and high-quality voice and broadband services?

"h.     Does the application raise issues pertinent to the []PUC's Environmental Social Justice Action Plan (ESJAP), and if so, whether the objectives of the ESJAP are met?"

These issues are broad enough to cover broadband service quality and do not indicate that it would not be addressed.  Volcano Telephone's opening brief before the PUC addressed whether expansion of service quality reports to ISP operations was appropriate.  In context, we agree with the PUC's assertion that annual reporting of broadband service quality metrics was, at a minimum, encompassed in issue "g," because an informed observer would have reasonably understood that the scope to be addressed included consideration of a proposed expansion of service quality reports to ISP operations.  (See *BullsEye Telecom, Inc. v. Public Utilities Com.* (2021) 66 Cal.App.5th 301, 327 [decision "did *not* resolve issues not encompassed by the Scoping Memo"].)  A scoping memo need not "detail every possible outcome of a proceeding."  (*Golden State Water Co. v. Public Utilities Com., supra*, 16 Cal.5th at p. 396.)  Further, Petitioners have not shown they were prejudiced by any departure from the scoping memo or addressed

15

whether we can depart from those authorities requiring a showing of prejudice.[6]  (See *BullsEye Telecom, supra*, at p. 324 ["petitioners have not shown any deviation from the Scoping Memo was significant or that they were prejudiced by it"].)  They explain that Volcano Telephone's challenges to the proposed broadband service quality metrics and reporting requirements "focused on how it exceeded the scope because the metrics were unrelated to the reasonableness of Volcano [Telephone]'s proposed network investments." (Emphasis omitted.)  This does not suggest Petitioners lacked notice of the issue or time to respond or that there was other evidence or argument they could or would have presented.  (See *Southern California Edison Co. v. Public Utilities Com.* (2006) 140 Cal.App.4th 1085, 1106 [finding prejudice where parties had insufficient time to respond to new proposals].)  We therefore reject Petitioners' arguments based on alleged deviation from the scoping memo.

   2.   *Alleged Departure from Precedent*

Petitioners argue Ordering Paragraph 3 departs from the PUC's precedent and violates their equal protection rights.

Petitioners fail to set forth or even address the requirements for establishing an equal protection claim in this context.  We need not research and develop their claim for them. (*Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 593.)

As for the assertion that the PUC abused its discretion by arbitrarily and capriciously departing from precedent, we are unpersuaded.  By "precedent," Petitioners mean earlier decisions not to apply the same requirements rather than any decisions regarding whether the PUC may do so.  Petitioners cite evidence that in three earlier rate

---

[6]  In *Golden State Water Co. v. Public Utilities Com., supra*, 16 Cal.5th 380, our Supreme Court assumed but did not decide whether a showing of prejudice was required where the PUC has not complied with the statutory scoping memo requirement.  (*Id*. at p. 398.)

16

cases, the PUC did not establish similar informational requirements to Ordering Paragraph 3. In denying Petitioners' petition for hearing, the PUC explained that it was within its discretion to address broadband service quality metrics in Volcano Telephone's rate case instead of deferring the matter to an open rulemaking. The PUC also explained that circumstances had changed since the issuance of the Ducor Telephone Company and Foresthill Telephone Company rate case decisions in 2019: "As Volcano testifies, 'the economy has shifted to significant reliance on broadband-based applications and services, particularly in response to the COVID-19 pandemic. . . .' [Citation.] Accordingly, the need for high-quality broadband services, and relatedly for information on the quality of those services has become *even more important* since before the pandemic." (Italics added.) Petitioners do not effectively rebut this point. Rather, they argue the PUC did not identify any changed circumstances from Sierra Telephone Company's rate case, which was pending at the same time. We are unpersuaded. While both the Sierra Telephone and Volcano Telephone rate cases were pending at the same time, the PUC issued the Sierra Telephone decision before the decisions at issue in this proceeding. (Cal.P.U.C., Dec. No. 23-01-004 (Jan. 12, 2023) pp. 1, 3.) The PUC explained its decision to address broadband service quality metrics in the Volcano Telephone rate case "is supported by lessons learned from the history of contentious discovery disputes and the corresponding use of party and [PUC] resources, making even more evident to [them] the potential need for a different approach." The Sierra Telephone decision did not contain a similar order to Ordering Paragraph 3, but it reflected a contentious discovery dispute and rejected similar arguments by Sierra Telephone that it was not required to provide information related to the service quality of the broadband service offered by Sierra Telephone's ISP affiliate over Sierra Telephone's broadband-capable network. (Cal.P.U.C., Dec. No. 23-01-004 (Jan. 12, 2023) pp. 32-34, 42-45.) The administrative law judge had apparently granted a motion to compel on this issue. (*Id*. at p. 34, fn. 77.)

17

Petitioners have failed to demonstrate that the decision to address the issue in Ordering Paragraph 3 in this proceeding was an abuse of discretion.

        *3.     Jurisdiction*

Petitioners argue Ordering Paragraph 3 exceeds the PUC's jurisdiction because the PUC has no jurisdiction over Volcano Vision. "The PUC is constitutionally vested with the authority to regulate public utilities." (*PG&E Corp. v. Public Utilities Com*. (2004) 118 Cal.App.4th 1174, 1197.) Petitioners' arguments overstate Ordering Paragraph 3 because they imply, incorrectly, that the PUC is imposing requirements for service quality on Volcano Vision rather than acquiring information from Volcano Telephone about the quality of the facilities it is asking the PUC to subsidize. We disagree with any suggestion that Ordering Paragraph 3 constitutes an exercise of general jurisdiction over Volcano Vision. When it has been authorized to do so by the Legislature, the PUC may, as it has done here, "exercise limited jurisdiction over entities other than public utilities." (*Ibid*.) Section 701 is one such legislative authorization. It provides "[t]he commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction." (§ 701.) This statute "is of particular relevance because it allows the PUC to 'do all things . . . necessary and convenient' in the exercise of its authority over public utilities whether or not 'specifically designated' in the Public Utilities Code. Where the authority sought is 'cognate and germane' to utility regulation, the PUC's authority under section 701 has been liberally construed." (*PG&E Corp., supra,* at p. 1198.) Section 701 does not confer upon the PUC powers that are contrary to other legislative directives (*PG&E Corp., supra*, at p. 1199), but Petitioners have identified no contrary directives. Section 275.6 directs the Commission to set Volcano Telephone's rates, include reasonable investments in broadband-capable facilities in Volcano Telephone's rate base, and ensure that A-Fund support is not excessive. (§ 275.6, subd. (c)(1), (6) & (7).) This is the authority the PUC

18

relies on to order Volcano Telephone to submit reports regarding Volcano Vision's broadband service quality. We agree with the PUC that it is implicitly authorized to exert limited jurisdiction over Volcano Vision for the limited purpose of Ordering Paragraph 3, which is cognate and germane to the PUC's regulatory authority over Volcano Telephone and the A-Fund.

### 4. Adequacy of Findings and Citations to Evidence

Petitioners contend the Decision does not contain any findings of fact to support Ordering Paragraph 3 and that it fails to cite record evidence. We may review whether the PUC's decision was "supported by the findings." (§ 1757, subd. (a)(3).) The Decision explains that the Public Advocates Office sought, and Volcano Telephone initially refused to provide, information related to the service quality of the broadband service offered by Volcano Vision over Volcano Telephone's broadband-capable network. The PUC set forth the parties' positions, including the legal basis for the Public Advocates Office's position, and explained the assigned administrative law judge issued a ruling ordering Volcano Telephone to submit data responses for 2018-2021 (the period after Volcano Telephone's revenue and rate design were last examined). The PUC rejected Volcano Telephone's assertion that the Public Advocates Office had no right to information regarding Volcano Vision and explained that "broadband service quality, and the funding anticipated toward Volcano [Telephone]'s proposed broadband infrastructure upgrades, and current and anticipated customer needs, are an appropriate element of its revenue requirement and rate design." Further, the PUC explained it considers factors such as service quality in evaluating broadband-capable network investments and the information at issue is useful in an oversight capacity as well as in future general rate cases. Annual reporting provides a consistent record that allows the PUC to evaluate broadband service quality over time and between rate cases in preparation for the next general rate case. The PUC also stated that it agreed with the Public Advocates Office's and the administrative law judge's "analyses for compelling discovery of broadband

19

service quality metrics, and ultimately adopted that reasoning as our findings in support" of Ordering Paragraph 3. It thus appears Ordering Paragraph 3 was supported by the findings. To the extent Petitioners rely on section 1705, which provides that, after a hearing, the PUC must issue a decision that contains "separately stated, findings of fact and conclusions of law by the commission on all issues material to the order or decision" (§ 1705), this statute was not cited in their petition for rehearing. Therefore it appears "the issue is not properly before us. In reviewing a PUC decision on a writ of review, 'the petitioner may not raise in court a matter not included in its application for rehearing' to the PUC of its decision." (*Pacific Gas & Electric Co. v. Public Utilities Com., supra*, 237 Cal.App.4th at p. 863, fn. 28.) Nonetheless, under this statute, " '[e]very issue that must be resolved to reach that ultimate finding is "material to the order or decision," ' and findings are required of the basic facts upon which the ultimate finding is based." (*Greyhound Lines, Inc. v. Public Utilities Com.* (1967) 65 Cal.2d 811, 813.) The "standard [is] a statement which will allow us a meaningful opportunity to ascertain in the principles and facts relied upon by the Commission in reaching its decision." (*Toward Utility Rate Normalization v. Public Utilities Com.* (1978) 22 Cal.3d 529, 540.) The Decision as modified meets this standard with respect to Ordering Paragraph 3. We note the PUC also explained that, as discussed above, it "ordered Volcano [Telephone] to submit reports on Volcano Vision's broadband service quality to help ensure that Volcano [Telephone]'s investments in broadband-capable facilities are reasonable and, in turn, set reasonable rates and subsidy amounts for Volcano [Telephone]" pursuant to section 275.6, which directs the Commission to set Volcano Telephone's rates, include reasonable investments in broadband-capable facilities in Volcano Telephone's rate base, and ensure that A-Fund support is not excessive. (§ 275.6, subd. (c)(1), (6) & (7).) "[I]ts findings and conclusions adequately dispose of all issues raised by petitioner which were necessary and relevant to its decision." (*Goldin v. Public Utilities Com., supra*, 23 Cal.3d at p. 670.) Petitioners do not identify any requirement that a decision "*cite* to record

20

evidence" as opposed to being generally supported by substantial evidence. "To accomplish the overturning of a Commission finding for lacking the support of substantial evidence, the challenging party must demonstrate that based on the evidence before the Commission, a reasonable person could not reach the same conclusion. [Citations.] It is for this reason that the Commission's factual findings are almost always treated as ' "conclusive" ' [citation], 'final and not subject to review.' " (*Pacific Gas & Electric Co. v. Public Utilities Com., supra*, 237 Cal.App.4th at p. 839.) Here, Ordering Paragraph 3 was supported by the evidence because it related to the reasonableness of Volcano Telephone's funding requests and assists the PUC in assessing the quality, reliability, and safety of Volcano Telephone's broadband services and ensuring that A-Fund subsidies used to support broadband result in high service quality performance. As such, we reject Petitioners' assertion that the PUC did not proceed in a manner required by law because the Decision does not include findings of fact that support Ordering Paragraph 3.

D.     *Inflation Factor*

Petitioners argue the Decision adopted expense caps and operating expense figures that did not account for the impact of inflation through the 2023 test year. As our Supreme Court has explained, "The basic approach of the commission in rate making . . . is to take a test year and determine the revenues, expenses, and investment for the test year. . . . [T]he test period results are adjusted to allow for reasonably anticipated changes in revenues, expenses, or other conditions 'so that the test-period results of operations as determined by the commission will be as nearly representative of future conditions as possible.' " (*City of Los Angeles v. Public Utilities Com.* (1972) 7 Cal.3d 331, 346-347.) In a prior proceeding, the PUC adopted the FCC's corporate and operating expense caps and directed use of NECA's inflation factors. (Cal.P.U.C., Dec. No. 21-06-004 (June 3, 2021) pp. 23-27.) In this proceeding, the PUC applied those

21

factors and adjusted the figures each year for inflation.[7] Petitioners' argument relies on the fact that, in denying their petition for rehearing, the PUC "recognize[d] that NECA's inflation factors are two years in arrears and not used by NECA to project future inflation." As the PUC explained, "This distinction, however, does not affect our adopted methodology, which relies on NECA's approved inflation factors. [Citation.] Consistent with NECA's approach for calculating federal universal service fund support, we applied NECA's inflation factor of 1.0180 for calendar year 2021 (inflation change from 2018-2019), adjusting this amount by NECA's inflation factor of 1.0130 for calendar year 2022 (inflation change from 2019-2020), and adjusting this amount by NECA's inflation factor of 1.042 for calendar year 2023 (inflation change from 2020-2021)." In other words, while the NECA inflation factors for calendar year 2023 may not have been available, Petitioners have not demonstrated the use of NECA's inflation factors in this proceeding was an abuse of discretion or unsupported by the record.

E.    *Alleged Preemption*

At the time the petition was filed, broadband Internet access services were classified by the FCC by a 2018 order as an "information service," rather than a "telecommunications service," and were thus "exempted . . . from utility-style regulation under title II of the 1996 Telecommunications Act." (*Calaveras I*, *supra*, 87 Cal.App.5th at p. 800.) The 2018 order reversed a 2015 order that had classified broadband Internet access as a "telecommunications service." (*In the Matter of Restoring Internet Freedom* (2018) 33 F.C.C.R. 311 ¶¶ 1-2 [2018 FCC LEXIS 44].) The petition for writ of review argued the Decision's implementation of broadband imputation and Ordering Paragraph 3 conflict with federal law by subjecting Volcano Vision to a public utility ratemaking process and public-utility style regulations. As set forth in more detail below, this

_____

[7] "In all collateral actions or proceedings, the orders and decisions of the commission which have become final shall be conclusive." (§ 1709.)

22

characterization of broadband imputation and Ordering Paragraph 3 is unpersuasive. Petitioners' arguments also relied on a federal district court case that has now been reversed in which the district court concluded that a New York law requiring broadband service to be offered to qualifying low-income customers at or below certain price ceilings was preempted because it was "rate regulation." (See *New York State Telecommunications Association, Inc. v. James* (E.D.N.Y. 2021) 544 F.Supp.3d 269, 281-282, revd. (2d Cir. 2024) 101 F.4th 135. Thus, Petitioners' original preemption argument was unavailing.

While the petition was pending in this court, the FCC reclassified broadband Internet access service as a telecommunications service in the 2024 FCC Order, further nullifying Petitioners' earlier preemption arguments. The parties thereafter filed supplemental briefs on preemption. After supplemental briefing, the United States Court of Appeals, Sixth Circuit set aside the 2024 FCC Order in *In re MCP No. 185* (6th Cir. 2025) 124 F.4th 993, 1013. Because history suggests the status of broadband Internet as a telecommunications service may change, we still address Petitioners' arguments pertaining to the 2024 FCC Order:

Petitioners argue the Decision's implementation of broadband imputation and "broadband service quality regulations" are expressly preempted based on the FCC's forbearance directives in the 2024 FCC Order. Petitioners also argue the PUC's application of broadband imputation and broadband service quality regulations conflict with the FCC's adoption of a uniform and tailored regulatory framework for broadband services and the FCC's goals of fostering broadband deployment and investment. The burden is on the party claiming preemption to prove it. (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc*. (2007) 41 Cal.4th 929, 936.) Petitioners have failed to do so. Their arguments are not anchored to any legal authority explaining the relevant standard(s) for the type of preemption they claim or the presumptions against preemption relative to this area of regulation. (See, e.g., *id*. at pp. 935-936; *MetroPCS*

23

*California, LLC v. Picker* (9th Cir. 2020) 970 F.3d 1106, 1117-1119.) Though we are under no obligation to develop their claims for them, we will observe generally that "[a]long with Congress, 'a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation.' " (*Barrientos v. 1801-1825 Morton LLC* (9th Cir. 2009) 583 F.3d 1197, 1208.) "Where, as here, we consider whether a federal agency has preempted state regulation, we do not focus on Congress's 'intent to supersede state law' but instead ask 'whether [the federal agency] meant to pre-empt [the state law].' " (*MetroPCS California, supra*, at p. 1117.)

### 1. Express Preemption

Petitioners argue the Decision's implementation of broadband imputation and its "broadband service quality regulations" are expressly preempted based on the FCC's forbearance directives in the 2024 FCC Order. The 2024 FCC Order explains that "[r]eclassification enables the Commission to establish a nationwide framework of open Internet rules for [broadband Internet access service] providers that will protect consumers from conduct harmful to Internet openness while allowing the Commission to preempt any state or local measures that interfere or are incompatible with the federal regulatory framework we establish." (2024 FCC Order, ¶ 3.) The 2024 FCC Order established rules that prohibit specific practices that are harmful to an open internet, such as blocking, throttling, and paid prioritization. (2024 FCC Order, ¶¶ 7-8, 29, 443, 494-510.) The order also adopted a general conduct standard designed to prevent practices that harm internet openness and updated the transparency rule. (2024 FCC Order, ¶¶ 7, 29, 516, 551.) Petitioners' arguments are based on what the FCC decided not to do.

Under the Telecommunications Act, forbearance prevents the PUC from enforcing provisions that the FCC has determined to forbear. (See 47 U.S.C. § 160(e) ["A State commission may not continue to apply or enforce any provision of this Act . . . that the Commission has determined to forbear from applying under subsection (a)"].) The 2024 FCC Order forebears from rate regulation, recordkeeping requirements, reporting

24

requirements, and most information collection and reporting requirements[8] of the Telecommunications Act insofar as they arise from the reclassification of broadband internet access service in the 2024 FCC Order. (2024 FCC Order, ¶¶ 396, 426.) The forbearance does not expressly preempt the implementation of broadband imputation or Ordering Paragraph 3. The PUC is not regulating Volcano Vision's rates directly or indirectly. With respect to the information collecting and reporting provisions of the Telecommunications Act that it forbore, the FCC explained that "[t]hese provisions principally are used by [it] to implement its traditional rate-making authority over common carriers," and "[s]ince [it is] not applying tariffing requirements to [broadband Internet access service] nor engaging in *ex ante* or *ex post* rate regulation of [broadband Internet access service], it is not clear what purpose these provisions would serve." (2024 FCC Order, ¶ 396.) We cannot conclude the FCC's forbearance of most information collection and reporting requirements expressly preempted Ordering Paragraph 3. Put differently, the FCC does not indicate a desire to preempt any attempt to obtain information concerning broadband service quality on the part of the PUC.

Indeed, the FCC expressly avoided stating any express preemption with respect to broadband imputation: "A group of California Independent Small [Local Exchange Carrier]s ask us to preempt several []PUC decisions regulating rates for intrastate telephone service, insofar as those telephone service rates take into account a company's broadband revenues or those of its affiliates. We find that those decisions are outside the scope of this proceeding, which concerns the regulatory framework that applies to [broadband Internet access service], not rates for or regulation of traditional telephone service. The California Independent Small [Local Exchange Carrier]s or other parties are

---

[8] The FCC did not forbear from sections 218, 219, and 220(a)(1) and (c)-(e) of the Telecommunications Act in order to promote national security, public safety, and improve network resiliency. (2024 FCC Order, ¶¶ 347-348.)

free to raise this issue in an appropriate proceeding, but we express no views on it here." (2024 FCC Order, ¶ 274, fns. omitted.) The FCC also "decline[d] requests to categorically preempt all state or local regulation affecting [broadband Internet access service] in the absence of any specific determination that such regulation interferes with our exercise of federal regulatory authority. The [Telecommunications] Act establishes a dual federal-state regulatory system in which the federal government and the states may exercise concurrent regulatory authority over communications networks." (2024 FCC Order, ¶ 268, fn. omitted.) The FCC further declined to address the extent of state authority to adopt broadband affordability programs, but noted that "the mere existence of a state affordability program is not rate regulation." (2024 FCC Order, ¶ 275.) The 2024 FCC Order explains that, as a general matter, the FCC will exercise its "authority to preempt any state or local measures that interfere or are incompatible with the federal regulatory framework" but will "proceed incrementally by considering such measures on a case-by-case basis as they arise 'in light of the fact specific nature of particular preemption inquiries.'" (2024 FCC Order, ¶ 265, fn. omitted; see also 2024 FCC Order, ¶ 268 ["[w]here state or local laws do unduly frustrate or interfere with interstate communications . . . we have ample authority to address and preempt those laws on a case-by-case basis as they arise"].) The FCC also observed that it "has previously stated that 'whenever possible,' preemption should be applied 'narrow[ly]' in order 'to accommodate differing state views while preserving federal goals.'" (2024 FCC Order, ¶ 268.) We reject Petitioners' express preemption argument.

*2.      Conflict Preemption*

Petitioners argue the PUC's application of broadband imputation and broadband service quality regulations conflict with the FCC's adoption of a uniform and tailored regulatory framework for broadband services and the FCC's goals of fostering broadband deployment and investment. We disagree.

26

Though Petitioners do not acknowledge the relevant legal standards, "[c]onflict preemption occurs when 'it is impossible to comply with both state and federal requirements,' or when 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' . . . To evaluate whether a state law poses an obstacle to the implementation of a federal program, 'the Supreme Court has stated that the "pertinent question [ ]" is whether the state law "sufficiently injure[s] the objectives of the federal program to require nonrecognition." ' [Citations.] The mere 'fact that there is "[t]ension between federal and state law is not enough to establish conflict preemption." ' " (*MetroPCS California, LLC v. Picker, supra*, 970 F.3d at pp. 1117-1118.) Petitioners have failed to demonstrate conflict preemption based on the 2024 FCC Order.

We have identified no suggestion in Petitioners' supplemental briefing that it is impossible to comply with both the 2024 FCC Order and the decisions at issue in this proceeding. Nor does the PUC's Decision stand as an obstacle to the implementation of the 2024 FCC Order. The Decision does not regulate the rates of Volcano Vision, but rather the rates of Volcano Telephone.[9] (See 2024 FCC Order, ¶ 281.) Broadband imputation, as we have discussed, is focused on ensuring the PUC does not excessively compensate the public utilities it regulates. The requirements of Ordering Paragraph 3 are informational requirements focused on achieving that goal. They do not regulate Volcano Vision's service quality. In rejecting Petitioners' taking argument, we have effectively explained that Petitioners have not established that, as they suggest, broadband imputation "results in an indisputable shortfall of $1,592,174 in Volcano

---

[9] The PUC argues Petitioners are precluded by their earlier challenge to the Imputation Decision from again arguing broadband imputation is a public utility style regulation of Volcano Vision. We need not address whether issue preclusion applies to this assertion because we conclude it is without merit.

[Telephone]'s rate design and a drastic reduction of its authorized rate of return on investments from 9.12% to 3.48%, which will clearly jeopardize Volcano [Telephone]'s ability to invest in its broadband-capable network." We also reject the assertion that the "costs and burdens of the information collecting and reporting requirements" are sufficient to show preemption. The 2024 FCC Order explains that the decision to reclassify broadband Internet access service "accounts for certain statutory responsibilities and policy concerns—especially safeguarding public safety and providing a uniform regulatory framework for [broadband Internet access service]." (2024 FCC Order, ¶ 244, fn. omitted.) The order also explains that while "[a]ppropriate regulation is often required to create market conditions that support infrastructure investment, . . . [o]n balance, . . . [the FCC's] approach is unlikely to reduce, and would likely promote, overall investment and innovation in the Internet ecosystem." (2024 FCC Order, ¶ 279.) With respect to the objectives of the 2024 FCC Order, the FCC explained that it "exercise[d] broad forbearance—including no rate regulation, no tariffing, no unbundling of last-mile facilities, and no cost accounting rules—. . . to ensure that the regulatory environment is properly tailored to protect consumers and achieve other important public interest responsibilities while not unnecessarily stifling investment and innovation." (2024 FCC Order, ¶ 6.) Petitioners rely on these provisions, but we are unable to conclude they have demonstrated any preemption of the Decision based on this language or the 2024 FCC Order.

## III.  DISPOSITION

Decision No. 23-02-008, as modified by Decision No. 23-08-051, is affirmed.

Respondent Public Utilities Commission shall recover its costs in this proceeding.  (Cal.

Rules of Court, rule 8.493(a).)

/S/

_____

RENNER, J.

We concur:

/S/

_____

ROBIE, Acting P. J.

/S/

_____

FEINBERG, J.